```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA


   DAMIEN MALCOLM,                    Civil Action
                  Plaintiff,          No. 24-53
      vs.

   PORTFOLIO RECOVERY ASSOCIATES,
   LLC,
                  Defendant.
   _____     _____
   ROBERT SOFALY,
                  Plaintiff,          Civil Action
      vs.                             No. 23-2018

   PORTFOLIO RECOVERY ASSOCIATES,
   LLC,
                  Defendant.


                         - - -


      Transcript of In-Person Hearing on February 20, 2024, in
   the United States District Court, 700 Grant Street,
   Pittsburgh, PA 15219, before Honorable Cathy Bissoon, United
   States District Judge.


   APPEARANCES:

      For the Plaintiffs:    J.P. WARD & ASSOCIATES
                             Joshua P. Ward, Esquire
                             Travis Andrew Gordon, Esquire
                             201 S. Highland Avenue
                             Suite 201
                             Pittsburgh, PA  15206

      For the Defendant:     MESSER STRICKLER BURNETTE, LTD.
                             Lauren M. Burnette, Esquire
                             Spencer M. Schulz, Esquire
                             12276 San Jose Blvd., Suite 718
                             Jacksonville, FL  32223

                             Keith McGurgan, Esquire

      Court Reporter:        Veronica R. Trettel, RMR, CRR
                             U.S. Courthouse
                             700 Grant Street
                             Suite 5300
                             Pittsburgh, Pennsylvania 15219
```

# I N D E X

WITNESSES:                                              PAGE

DAMIEM MALCOLM
     By The Court ...............................     6

ROBERT SOFALY
     By The Court ...............................    11

TORI SALADA
     By The Court...............................    16

MARK HOLLINGSWORTH
     By The Court...............................    21

JOHN HODIL
     By The Court...............................    27

JOSHUA PAUL WARD
     By The Court...............................    32

TRAVIS ANDREW GORDON
     By The Court...............................    46

RYAN JAMES
     By The Court...............................    62

1                          P-R-O-C-E-E-D-I-N-G-S

2                     Tuesday Morning, February 20, 2024

3              THE COURT:  Okay, be seated.  Now is the time for the

4    hearing in the Damien Malcolm versus Portfolio Recovery

5    Associates, and Robert Sofaly versus Portfolio Recovery

6    Associates, Case Numbers 24-53 and 23-2018 respectively.

7              Can counsel please identify themselves for the

8    record.

9              MR. WARD:  Good morning, Your Honor.  Attorney Josh

10   Ward on behalf of the plaintiff.

11             MR. GORDON:   Attorney Travis Gordon on behalf of the

12   plaintiffs, Mr. Sofaly and Mr. Malcolm.

13             MS. BURNETTE:  Good morning.  Lauren Burnette for

14   Portfolio Recovery Associates.

15             THE COURT:  Okay.  And who is joining you,

16   Ms. Burnette, today?

17             MS. BURNETTE:  To my right is Keith McGurgan who is

18   general counsel at Portfolio Recovery Associates, and to his

19   right is Spencer Schulz, who is also counsel of record.

20             THE COURT:  Very good.  Okay.  And who do you have

21   with you today, Mr. Ward?

22             MR. WARD:  We have Mr. Sofaly, Mr. Malcolm, and as

23   instructed, we have certain members of our staff.  We have

24   Mark Hollingsworth, paralegal.  Please raise your hand for the

25   Court.  Tori Salada, legal assistant.  And we also have Jack

1    Hodil, who is a project manager and holds various -- has

2    various hats within the firm.

3            THE COURT:  Okay.  And if you wouldn't mind just

4    pointing out to me which of your clients is which back there.

5            MR. GORDON:  Mr. Damien Malcolm would be sitting to

6    your left, Your Honor, and Mr. Robert Sofaly to your right,

7    Your Honor.

8            THE COURT:  Okay.  Thank you.  All right.

9            As the Supreme Court recognized, this court, like

10   other federal courts, maintains the inherent authority to

11   supervise the conduct of attorneys admitted to practice before

12   it and to maintain control over the proceedings before the

13   court.

14           Additionally, attorney misconduct occurring during

15   the pendency of a case assigned to a judge of this court may

16   be subject to attorney discipline and sanctions and other

17   consequences in the case, as well as a separate attorney

18   disciplinary proceeding before the court.

19           So I may have some questions for all of you here

20   today and, as a result, I'm going to ask Joungsun if she could

21   please swear you all in, and that would include all lawyers

22   present, as well as the clients and the paralegals.

23           THE DEPUTY CLERK:  Raise your right hands.

24           (Whereupon, the oath was administered.)

25           THE DEPUTY CLERK:  You may lower your hands.  Please

1  be seated.

2          THE COURT:  Okay.  Additionally, I'm not entirely

3  certain what will come out of today's hearing.  No one is

4  currently accused of committing any crime, but out of an

5  abundance of caution, you do have the right to remain silent.

6  Anything you say can and will be used against you in court.

7          If during the course of today's hearing you have a

8  reasonable belief that the statements asked for might be used

9  against you in some current or future criminal proceeding, you

10 may invoke your right to remain silent in response to any of

11 my questions.  Simply say, "I wish to plead the 5th."

12         Finally, I want to make sure everybody understands

13 that perjury is a crime, and answering any of my questions

14 today untruthfully constitutes perjury.  Everybody understand?

15 (All present answered, "Yes, Your Honor.")

16         THE COURT:  Excellent.  All right.  So why don't we

17 get started here.  We're going to start with your clients,

18 Mr. Ward.  I understand that one of them is unable to really

19 maneuver over to the witness stand.

20         MR. WARD:  I believe he can, Your Honor.

21         DAMIEN MALCOLM:  It will take some time, Your Honor.

22         THE COURT:  I'll start with Mr. Malcolm.  If you

23 wouldn't mind coming over to the witness stand.  Thank you.

24         DAMIEN MALCOLM:  I apologize, Your Honor.

25         THE COURT:  Take your time.  That is perfectly fine.

1           Joungsun, if you wouldn't mind distributing this to

2    counsel.

3           DAMIEN MALCOLM:  Thank you very much.

4           <u>DAMIEN MALCOLM</u>, having been previously sworn, was

5    examined and testified as follows:

6           THE COURT:  Mr. Malcolm, first, if you can just state

7    your name for the court reporter.

8           DAMIEN MALCOLM:  Damien Thomas Malcolm.

9           THE COURT:  Mr. Malcolm, you are a client of the Ward

10   firm; is that correct?

11          DAMIEN MALCOLM:  I am, yes.

12          THE COURT:  And I'm showing you a letter that was

13   attached to the complaint in this matter.  Have you ever seen

14   this letter?

15          DAMIEN MALCOLM:  Yes, I have.

16          THE COURT:  Okay.  Tell me about this letter.

17          DAMIEN MALCOLM:  Due to the distance and the agency

18   that I assigned to Attorney Gordon specifically, this was

19   discussed with me on several occasions that because of my

20   disability and the difficulties in both writing and

21   maneuvering, that they would draw up this letter on my behalf

22   and this would be sent to Portfolio on my behalf, that they

23   would act as my attorneys.

24          THE COURT:  Okay.  And this particular signature on

25   this document, is this your signature?

1            DAMIEN MALCOLM:  No, this is not my signature.  This

2      is, again, assigned as agency to the attorneys to do so,

3      mostly due to timing and the necessity to get this completed

4      as quickly as possible.

5            THE COURT:  Okay.  What did you understand this

6      letter to be?

7            DAMIEN MALCOLM:  Well, this letter is an explanation

8      letter as to why we have come to the situation that we are in,

9      my personal circumstances, and as part of the correspondence

10     to Portfolio Recovery to come to some matter of attritional

11     needs with these matters, being debt.

12            THE COURT:  So this letter represents your personal

13     circumstances?

14            DAMIEN MALCOLM:  Not -- ostensibly, yes.  Not exactly

15     per se, but this is a general overview.

16            THE COURT:  Okay.  So you apparently don't know how

17     to operate in the digitized world; is that accurate?

18            DAMIEN MALCOLM:  I have difficulty with it.

19            THE COURT:  So you indicated that here?  These are

20     your words?

21            DAMIEN MALCOLM:  Yes, as dictated essentially.

22            THE COURT:  So you dictated this letter?

23            DAMIEN MALCOLM:  Not directly word for word.  This

24     was prepared by them, we reviewed it together, and I agreed

25     that this seemed to be acceptable and sufficient.

1          THE COURT:  So tell me towards the end of this letter

2     about this TV.

3          DAMIEN MALCOLM:  This is the only thing I have left

4     in my life.  I just want to raise my children and spend time

5     with them.

6          THE COURT:  Sir, tell me about this TV at the end of

7     this letter.

8          DAMIEN MALCOLM:  What would you like to know

9     about it?

10         THE COURT:  Tell me about it.  Tell me about who

11     tried to sell it to you and why.

12         DAMIEN MALCOLM:  I mean, who tried to sell it to me?

13     I'm afraid I don't --

14         THE COURT:  If you could read the last line of the

15     letter to yourself and tell me about this TV that somebody was

16     trying to sell you.

17         DAMIEN MALCOLM:  I mean simply, it's the only

18     possession that I have left.  I wanted the television to enjoy

19     what little I can do at this point.  That has been over my

20     head and crippling, which is a game that -- actually from my

21     divorce and put me in a position where all of my possessions

22     are gone.  I have nothing left.

23         THE COURT:  So you just want to watch the TV games on

24     Sunday and they are trying to sell you some -- I believe it

25     says XR65A80K --

1          DAMIEN MALCOLM:  I have so many phone calls and

2     communications from them quoting me all of these numbers and

3     all of these things, what felt like a very -- an attempt to

4     confuse me and get me to a point where I would sign or agree

5     to anything.

6          So I asked the attorneys to deal with this matter on

7     my behalf.  They had sent me a letter as part of this

8     proceedings.  I checked and did a little bit of diligence with

9     my partner who helped me to assess them as a firm.  They have

10    communicated well with me.  They have done everything that was

11    asked and presented me with the right options and helped to

12    get to this point.

13         This was the letter drafted, handwritten, again,

14    which I have difficulty with, was what I was told is the

15    process to follow.

16         THE COURT:  Okay.  Joungsun, if you wouldn't mind

17    providing these to counsel.  I'm going to give you another

18    letter here, Mr. Malcolm.

19         Now, Mr. Malcolm, you'll agree with me that is the

20    exact same letter.

21         DAMIEN MALCOLM:  It does appear to be.  Although,

22    obviously, this is not my name.

23         THE COURT:  Correct.  This was sent on behalf of

24    Mr. Sofaly.

25         DAMIEN MALCOLM:  Yes.

 1          THE COURT:  And it's very strange that you and

 2     Mr. Sofaly had the exact same experience --

 3          DAMIEN MALCOLM:  I can't speak --

 4          THE COURT:  -- the exact same TV.

 5          DAMIEN MALCOLM:  I can't speak for any other

 6     individuals.  I can only speak to my circumstances, and I know

 7     what was discussed between me and the attorneys.  I obviously

 8     don't know what they did.

 9          THE COURT:  And you were not directed to respond

10     untruthfully to any of my questions?

11          DAMIEN MALCOLM:  Certainly not.  Nor would I.

12          THE COURT:  All right.  And with respect to the

13     signature on the bottom of the letter that supposedly came

14     from you, do you know who affixed that signature to that

15     letter?

16          DAMIEN MALCOLM:  That's part of the firm's internal

17     process.  I don't know specifically, no.  I was advised this

18     would be prepared on my behalf.  This is part of I believe

19     their template in dealings with these goods or these types of

20     matters, and that's what they forwarded me.

21          They did show me this.  I have seen this.  This has

22     been part of the process and the correspondence.  They are the

23     specialists in this area.  I am not.  I found it very

24     distressing for me and my family, as much to the point where

25     Portfolio was calling my ex-wife to harass her.

1          At that point I had to absolve myself from dealing

2     with this.  It was beginning to very seriously affect my life

3     and very seriously affect my emotional well-being, and these

4     attorneys have acted very well on my behalf, and they have

5     been very kind and helpful and very open with their

6     communication.  I don't feel they have done anything

7     improprietous at all.

8          THE COURT:  Well, thank you very much, Mr. Malcolm.

9     That's all I have.

10         DAMIEN MALCOLM:  You're very welcome, Your Honor.

11    Thank you.  Would you like these?

12         THE COURT:  No, you can leave them there.  They are

13    going to come up again.

14         DAMIEN MALCOLM:  Certainly.  Thank you.

15         THE COURT:  With that, I'll ask Mr. Sofaly to come

16    up.

17         DAMIEN MALCOLM:  Careful.  There's a bit of a heck of

18    a step up there.

19         <u>ROBERT SOFALY</u>, a witness herein, having been

20    previously sworn, was examined and testified as follows:

21         THE COURT:  Mr. Sofaly, if you wouldn't mind just

22    stating your name for the court reporter.

23         ROBERT SOFALY:  Robert Sofaly.

24         THE COURT:  Mr. Sofaly, I would like you to take a

25    moment to look at those documents.  One of them is purportedly

1    signed by you.  Is that your signature on that document?

2              ROBERT SOFALY:  That's signed by the law firm.  I

3    give them the authority to handle my case, write letters to

4    the creditors that are bothering me, and I pretty much

5    authorized everything.

6              THE COURT:  Okay.  And if you could take a look at

7    the letter that is supposedly from you.  Have you seen that

8    letter before?

9              ROBERT SOFALY:  Yes.

10             THE COURT:  Okay.  And when did you see that letter?

11             ROBERT SOFALY:  Well, I told the law firm my thoughts

12   and everything.  They wrote it down.  They sent it to me,

13   telling me read what I told them.

14             THE COURT:  So you told them what's in this letter?

15             ROBERT SOFALY:  Yeah.  I mean, it was hard for me.

16   My --

17             THE COURT:  Let's not go there.  You told them what's

18   in this letter?

19             ROBERT SOFALY:  Pretty much, yes.

20             THE COURT:  What do you mean "pretty much"?

21             ROBERT SOFALY:  Not word for word.

22             THE COURT:  Okay.  So what in this letter did you

23   tell them?

24             ROBERT SOFALY:  About I'm getting --

25             THE COURT:  I'd ask you to take a look at this letter

1   and tell me what in this letter did you tell them?

2               ROBERT SOFALY:  It was just getting difficult for me

3   to put up with everything.

4               THE COURT:  So that's the only part of this letter

5   that you told them?

6               ROBERT SOFALY:  No.  I mean, about watching TV

7   sports.  I'm a sports fanatic.  Yeah, I watch TV.

8               THE COURT:  So tell me about that particular TV model

9   that you are referencing there in that letter.

10              ROBERT SOFALY:  To the best of my knowledge, I'm not

11  sure exactly what the numbers are.

12              THE COURT:  But you authorized them to offer that

13  number?

14              ROBERT SOFALY:  I'm not sure, ma'am.

15              THE COURT:  Okay.  Do you think it's a little strange

16  that you and Mr. Malcolm have the same TV that is at issue

17  here and are you confused about the same TV?

18              ROBERT SOFALY:  I'm not sure, ma'am.

19              THE COURT:  You're not sure.

20              ROBERT SOFALY:  Yeah, it's crazy, you're right.

21              THE COURT:  Right?  It seems crazy.  I agree.  I

22  mean, you'll admit that those are the same letters; correct?

23              ROBERT SOFALY:  I can't recall exactly what the

24  letters were.

25              THE COURT:  No, those two letters that you have in

1    your hand, the one from you supposedly and the one from

2    Mr. Malcolm are the exact same letters.

3              ROBERT SOFALY:  That's my signature and my birth date

4    and my Social Security.

5              THE COURT:  And the only thing that's different on

6    those two letters is the fact that one is from you and one is

7    from Mr. Malcolm, and the dates are different, and the

8    handwriting is different at the top.

9              ROBERT SOFALY:  I guess, ma'am.

10             THE COURT:  Mm-hmm.  And have you been instructed to

11   answer any of my questions untruthfully here today?

12             ROBERT SOFALY:  No, Your Honor.

13             THE COURT:  All right.  Thanks.  You can leave those

14   up there.

15             MR. WARD:  Your Honor, may I be heard?

16             THE COURT:  No, not yet.  Thank you.  You'll have a

17   chance to be heard, Mr. Ward.

18             MR. WARD:  Can I call the witness back up?

19             THE COURT:  No.  This is my hearing.  This is not an

20   advocacy situation.  This is my hearing to determine what

21   you've done.  So, no, we're not doing that yet.

22             If you have something to submit at some point, you

23   can certainly have that opportunity.  Right now, this is not

24   that kind of proceeding.

25             MR. WARD:  I just -- and I will, you know, be quiet,

1    but I think I should be afforded some procedural due process,

2    Your Honor.

3            THE COURT:  You absolutely may and you will

4    absolutely have an opportunity to explain everything that

5    you've done here.

6            MR. WARD:  Well, not just to explain what --

7            THE COURT:  If you have somebody to call at some

8    point, you may do that.

9            MR. WARD:  Thank you, Your Honor.

10           THE COURT:  Okay.  Thank you.  Now, Mr. Ward, with

11   respect to the letters that were generated by -- in the Sofaly

12   and the Malcolm cases, who actually wrote out these letters?

13           MR. WARD:  So --

14           MR. GORDON:  May I respond, Your Honor?

15           THE COURT:  Yes.

16           MR. WARD:  No, I would like to respond.  The question

17   was directed to me and you can supplement.  Is that okay, Your

18   Honor?

19           THE COURT:  Sure.

20           MR. WARD:  So these are form letters.  One was

21   drafted by Ms. Salada.  I believe the other one was drafted by

22   Mr. Hollingsworth, all at the direction of Attorney Gordon as

23   part of a practice which they intend to -- you know, it's part

24   of credit repair and auditing.

25           THE COURT:  I'm just asking who wrote the letters.

1          MR. WARD:  Salada and Mr. Hollingsworth.

2          THE COURT:  So did you say Salada is here?

3          MR. WARD:  Both of them are here, yes.

4          THE COURT:  Okay, let's start with Salada.

5          TORI SALADA, a witness herein, having been

6     previously sworn, was examined and testified as follows:

7          THE COURT:  Okay.  Yes, please.  If you could and if

8     you wouldn't mind stating and spelling your name for the court

9     reporter.

10          TORI SALADA:  Tori Salada, S-A-L-A-D-A.

11          THE COURT:  T-O-R-I?

12          TORI SALADA:  Yes, ma'am.

13          THE COURT:  Okay.  Very good.  What's your role,

14    Ms. Salada?

15          TORI SALADA:  I was a legal assistant at J.P. Ward &

16    Associates.

17          THE COURT:  With respect to the two documents in

18    front of you, can you tell me if you had any involvement with

19    either of the documents?

20          TORI SALADA:  Yes, mine would be --

21          THE COURT:  And if you wouldn't mind speaking

22    directly into the microphone.

23          TORI SALADA:  Yes, sorry.  I wrote the addresses, and

24    then I filled out their, like signatures and the date of

25    birth.

1        THE COURT:  For both of those?

2        TORI SALADA:  Yes, for both of them.

3        THE COURT:  Those do seem to be different

4   handwriting.  Is there some reason you employed different

5   handwriting for both of those?

6        TORI SALADA:  The contents of the letter were not

7   drafted by me.  They were drafted by Mark, but then I filled

8   them out for him.

9        THE COURT:  No.  I guess what I mean even with

10   respect to the address and the signature lines, those appear

11   to be different handwriting.

12        TORI SALADA:  This one for Damien is for sure my

13   handwriting.  This one I'm not positive.

14        THE COURT:  So you are not sure whether Sofaly is

15   your handwriting?

16        TORI SALADA:  It could be mine and I was writing

17   sloppily, but I believe it might be Mark's.

18        THE COURT:  So with respect to the contents of the

19   letter, do you know who actually wrote the contents of the

20   letter?

21        TORI SALADA:  I believe that was Mark.

22        THE COURT:  Okay.  And Mark's last name again?

23        TORI SALADA:  Hollingsworth.

24        THE COURT:  Hollingsworth.  Okay.  And tell me how

25   this works.  What is your job with respect to these letters?

1          TORI SALADA:  So I would get the cases from Jack and

2     I just --

3          THE COURT:  And who is Jack?

4          TORI SALADA:  He is the project manager.

5          THE COURT:  Okay.

6          TORI SALADA:  So then I would just put the Portfolio

7     or the company in, and I would fill out the client's

8     information and then send them off.

9          THE COURT:  Okay.  And with respect to the signatures

10    on these documents, who told you to sign these documents on

11    behalf of these clients?

12         TORI SALADA:  Well, the clients signed a POA so we

13    were sure that it was genuine signatures.

14         THE COURT:  And in that they authorized signatures?

15         TORI SALADA:  I believe so, yes.

16         THE COURT:  Who told you that?

17         TORI SALADA:  Everybody that I worked underneath.  So

18    Jack and Travis.

19         THE COURT:  And when you say "Jack and Travis," if

20    you wouldn't mind including their last names, that would be

21    helpful.

22         TORI SALADA:  Hodil and Gordon.  Sorry.

23         THE COURT:  So is this your only job at the Ward firm

24    or do you do anything else?

25         TORI SALADA:  Yeah, this is primarily my job.

1          THE COURT:  So this is your job, to write the address

2    and sign these documents?

3          TORI SALADA:  Yes.  I mean, I did other things, but

4    like secretarial tasks.

5          THE COURT:  And with respect to the contents of these

6    letters, do you have any idea where the contents come from?

7    We just heard Mr. Sofaly and Mr. Malcolm indicated that they

8    came from them.  Is that your understanding?

9          TORI SALADA:  I'm not exactly sure.

10          THE COURT:  Okay.  Who would know the answer to that?

11          TORI SALADA:  Probably anybody that was working

12    above me.

13          THE COURT:  Okay.  So certainly Mr. Ward and

14    Mr. Gordon would know the answer to that?

15          TORI SALADA:  Yes, absolutely.

16          THE COURT:  Okay.  And with respect to this

17    particular letter, you're familiar with the contents of this

18    letter, and, in fact, you've seen the contents of this letter

19    before?

20          TORI SALADA:  I've seen it, yes, but I didn't really

21    read it.

22          THE COURT:  Okay.  But this letter is familiar to

23    you.  Obviously you have seen it in two cases now.

24          TORI SALADA:  Yes.

25          THE COURT:  I assume you know that there are many

1    other cases where this letter has appeared.

2              TORI SALADA:  Yes.

3              THE COURT:  Okay.  And are you familiar with other

4    letters that are like this letter in the sense that you have

5    the same letter over and over again where you basically -- you

6    do the signing off on the letter, but the contents of the

7    letter are the same.

8              So, for example, there's a letter about a person who

9    desires to buy a bike.  Are you familiar with that letter.

10             TORI SALADA:  Not exactly.  Not specifically.

11             THE COURT:  Okay.  All right.  So let me ask you

12   this.  Are you only in charge of this letter, this particular

13   type of letter, the contents of this letter, the one -- do you

14   get a certain letter and does another paralegal get a

15   different letter?

16             TORI SALADA:  No, ma'am.  And I'm not a paralegal.  I

17   was just a legal assistant.  But the contents of the letter

18   was not my responsibility.  It was just filling out the form

19   for it, yeah.

20             THE COURT:  So you may have signed other forms on

21   behalf of your firm; is that accurate?

22             TORI SALADA:  In regards to like dispute letters,

23   yes.

24             THE COURT:  Joungsun, if you wouldn't mind passing

25   these out.

1          I'm going to show you another letter here.  Are you
2    familiar with this letter?  Well, there are several letters.
3    So you can take a look at them.
4          TORI SALADA:  In this one, only two I believe are in
5    my handwriting.
6          THE COURT:  Okay.  Can you tell me which two?
7          TORI SALADA:  The one that is on the back of the
8    first page, and then the one immediately following that, the
9    one for Damien Malcolm and then Carolyn Walker.
10          THE COURT:  Okay.  All right.  Joungsun, if you
11    wouldn't mind handing those out.
12          I'll ask you to take a look at that one.  This was
13    the one about the bicycle, indicating that the individual is
14    interested in a bicycle.  Are you familiar with this letter?
15          TORI SALADA:  No, ma'am, this one I am not familiar
16    with at all.
17          THE COURT:  Okay.  Very good.  Those are my
18    questions.  Thank you.
19          TORI SALADA:  Leave these up here?
20          THE COURT:  Yeah, you can leave them all there.
21          Mister -- is it Hollingsworth?  If you wouldn't mind.
22          MARK HOLLINGSWORTH, a witness herein, having been
23    previously sworn, was examined and testified as follows:
24          THE COURT:  Mr. Hollingsworth, if you wouldn't mind
25    just stating and spelling your name for the court reporter.

1          MARK HOLLINGSWORTH:  My name is Mark Hollingsworth,

2     H-O-L-L-I-N-G-S-W-O-R-T-H.

3          THE COURT:  Okay.  And with respect to -- let's just

4     start with Mr. Malcolm and Mr. Sofaly, Mr. Hollingsworth.

5     What is your role with respect to the letters in those cases,

6     if any?

7          MARK HOLLINGSWORTH:  I am a paralegal.  I drafted

8     these letters.

9          THE COURT:  Okay.  So you are the draft person for

10     these letters in terms of the content?

11          MARK HOLLINGSWORTH:  Yes.

12          THE COURT:  Okay.  Tell me about the content of these

13     letters.

14          MARK HOLLINGSWORTH:  The letter is primarily to

15     convey the dispute of the debt.

16          THE COURT:  So you are saying this letter is

17     primarily to convey the dispute of a debt?

18          MARK HOLLINGSWORTH:  Yes, Your Honor.

19          THE COURT:  And tell me where you got the narrative

20     for these letters.

21          MARK HOLLINGSWORTH:  I'm sorry, what do you mean?

22          THE COURT:  Where did the words from this letter come

23     from?

24          MARK HOLLINGSWORTH:  I drafted a general sentiment

25     about there were -- this one is about the difficulties of

1  navigating the digital age.  Then there's the debt dispute

2  clearly in there.  Then it continues on on that same thing of

3  the complexity of the digital age.

4          THE COURT:  And as far as the actual content is

5  concerned, tell me what your interactions were with

6  Mr. Malcolm and Mr. Sofaly.

7          MARK HOLLINGSWORTH:  My interactions with these

8  clients would have begun at the representation stage for the

9  FDCPA complaint.

10          At that point, we had already agreed to represent

11  them in terms of sending dispute letters.  We already had that

12  authorization to dispute these debts to Portfolio Associates,

13  and these letters were sent to do that.  After we --

14          THE COURT:  And if you wouldn't mind just speaking

15  into that mic.

16          MARK HOLLINGSWORTH:  Of course.  After the disputes

17  were sent and we would find the violation, we would go back

18  and discuss with the clients the process again.  That would be

19  me on the phone with them at that point.  And then if

20  everything with representation agreements went through, I

21  would draft a complaint and move on to that stage.

22          THE COURT:  And this letter in particular, had you

23  sent this letter out before any discussions with Mr. Malcolm

24  or Mr. Sofaly?  In other words, did this letter preexist any

25  relationship with Mr. Malcolm or Mr. Sofaly?

1          MARK HOLLINGSWORTH:  Looking at it, the timeline, the

2    Sofaly letter may have been drafted at that moment, but it was

3    then used later.

4          THE COURT:  So you are saying Mr. Sofaly's letter was

5    the template for Mr. Malcolm's letter?

6          MARK HOLLINGSWORTH:  It may have been my only -- you

7    know, the thing that would lead me to believe that, is that I

8    signed this one.  At that stage I was still addressing and

9    signing letters.

10          THE COURT:  So that's your signature on that

11    particular letter?

12          MARK HOLLINGSWORTH:  On Sofaly's letter, yes.

13          THE COURT:  I guess what I'm trying to get at is the

14    actual narrative that you offer in the context of these two

15    letters, did you write that before ever speaking with

16    Mr. Sofaly or Mr. Malcolm?

17          MARK HOLLINGSWORTH:  Yes.

18          THE COURT:  Okay.  And when did you write this

19    particular narrative?

20          MARK HOLLINGSWORTH:  If I had to ballpark it, it

21    would have been in and around August.  This is when the Sofaly

22    letter basically initiated the practice.

23          THE COURT:  So you're saying that this particular

24    letter, which I'll represent to you has come through our court

25    multiple times beyond Mr. Sofaly and Mr. Malcolm here, was

1   written sometime around the time that Mr. Sofaly submitted his

2   letter?

3             MARK HOLLINGSWORTH:  Within a couple of months.

4             THE COURT:  Okay.  And then can I ask why you used

5   the same letter then for Mr. Malcolm?  Mr. Malcolm informs us

6   that this letter is his feelings about things.

7             You'll agree with me that it's weird that Mr. Malcolm

8   and Mr. Sofaly have the same feelings about things?

9             MARK HOLLINGSWORTH:  I would say the feelings are

10   very general.

11            THE COURT:  You don't think they are specific at all?

12            MARK HOLLINGSWORTH:  There are specific details.

13            THE COURT:  There are specific details that you will

14   agree are the same; correct?

15            MARK HOLLINGSWORTH:  Yes, in these letters.

16            THE COURT:  In fact, the same as other letters of

17   this that are wandering around our courthouse; is that

18   accurate?

19            MARK HOLLINGSWORTH:  Yes.

20            THE COURT:  Are you also the author of the bicycle

21   letter?

22            MARK HOLLINGSWORTH:  Which letter is that?

23            THE COURT:  Yeah.  It's the letter -- oh, while I'm

24   doing this, with respect to -- that's the one that looks like

25   this, (indicating).

1            MARK HOLLINGSWORTH:   The Kayla Kantorowski letter.

2            THE COURT REPORTER:   I'm sorry, say it again,

3    Kayla --

4            THE COURT:   Kayla Kantorowski, K-A-Y-L-A,

5    K-A-N-T-O-R-O-W-S-K-I.

6            MARK HOLLINGSWORTH:   I did not author this letter.

7            THE COURT:   Do you know who did author this letter?

8            MARK HOLLINGSWORTH:   These appear to be -- no, I

9    don't know.

10           THE COURT:   Okay.  You are not sure who authored this

11   letter?

12           MARK HOLLINGSWORTH:   No.

13           THE COURT:   And so am I to understand that -- is

14   there another person who authors letters besides you?

15           MARK HOLLINGSWORTH:   No.  At the time we were taking

16   cases where we had not authored the letters at all.

17           THE COURT:   Okay.  And tell me about that time.

18           MARK HOLLINGSWORTH:   At that point, we were filing

19   the FDCPA claims for these plaintiffs that were working with a

20   credit repair organization.

21           THE COURT:   With respect to those letters that you

22   would send during the earlier time, were those typewritten

23   letters?

24           MARK HOLLINGSWORTH:   I'm sorry, at what point?

25           THE COURT:   Well, you said before you started using

1    these, you sent out letters.

2          MARK HOLLINGSWORTH:  In most of those cases, we

3    wouldn't send those letters.  The credit repair organization

4    and the plaintiff would come to us with the FDCPA claim.  At

5    that point we would prosecute it.

6          THE COURT:  So as you sit here today, you don't know

7    who authored the Kayla Kantorowski letter?

8          MARK HOLLINGSWORTH:  Not specifically, no.

9          THE COURT:  All right.  Thank you very much,

10   Mr. Hollingsworth.

11         Who else do we have back here, Mr. Ward?

12         MR. WARD:  Mr. Hodil is the only other staff member

13   other than Mr. Gordon and myself.

14         THE COURT:  Okay.  So let's call him.

15         JOHN HODIL, a witness herein, having been

16   previously sworn, was examined and testified as follows:

17         THE COURT:  If you wouldn't mind stating and spelling

18   your name for the court reporter.

19         JOHN HODIL:  John Hodil, H-O-D-I-L.

20         THE COURT:  Okay.  And, Mr. Hodil, tell me about your

21   role at the Ward firm.

22         JOHN HODIL:  So I'm a legal project manager.  I

23   direct and oversee numerous processes of the law firm,

24   including credit repair.

25         THE COURT:  Okay.  And do you oversee the preparation

1    of these, what I guess you are terming "dispute letters"?

2              JOHN HODIL:  Yes, I do.

3              THE COURT:  Okay.  With respect to the Kayla

4    Kantorowski letter that you see in front of you there, do you

5    know who created the narrative for that letter?

6              JOHN HODIL:  Kayla Kantorowski I believe was a client

7    that came to us from another credit repair organization.

8              THE COURT:  Not my question.  Who prepared this

9    letter?  Who wrote this letter?

10             JOHN HODIL:  I do not know.

11             THE COURT:  You don't know who wrote the letter?

12             JOHN HODIL:  No.  I was not there during the creation

13   of this letter.

14             THE COURT:  Okay.  Did you oversee sending this

15   letter out to Portfolio Recovery and other entities?

16             JOHN HODIL:  This letter was not sent by our firm.  I

17   can tell by the date because we were not doing credit repair

18   at that time.

19             THE COURT:  So this was not sent by your firm; is

20   that what you are suggesting?

21             JOHN HODIL:  Correct.

22             THE COURT:  Do you know who sent this?

23             JOHN HODIL:  One of the members of AIM Financial.

24             THE COURT:  Okay.  So turning your attention back to

25   the Sofaly and Malcolm letters, this letter was prepared by

1    the Ward firm; correct?

2              JOHN HODIL:  Correct.

3              THE COURT:  And about what year did you all start

4    engaging in this business?

5              JOHN HODIL:  Around -- 2023.  Early-mid 2023.

6              THE COURT:  Okay.  And so there's another document

7    there, a Heath Fegely letter with a cover on it.  So look

8    through those.  Those are all apart of the Ward firm's.

9              JOHN HODIL:  Yes, this is one of ours.

10             THE COURT:  Okay.  So the Fegely letter, the Walker

11   letter, the O'Connor -- O'Connis -- letter and the Boyle

12   letter are all yours?

13             JOHN HODIL:  Yes.  Malcolm is ours.  Sofaly is ours.

14   Fegely is ours.  Kantorowski is not.

15             THE COURT:  What did you under -- did you create this

16   process?

17             JOHN HODIL:  I helped in its origin.  We basically

18   were in a room when we were first templatizing these letters,

19   we wanted to basically capture the sentiment of many of our

20   clients.

21             So Mr. Malcolm, I'm sure he does relate to a lot of

22   the letter.  These were meant to be form letters.  We have I

23   don't know exactly how many, but we have many form letters

24   that we send out to these creditors during the credit repair

25   process.

1        We have the form letters and then we -- after getting

2   agency from the client, we make sure they always complete our

3   credit repair agreement.  We make sure that they know exactly

4   what we are doing.  They give us the agency to write their

5   names, sign at the bottom, and to send these to whichever

6   third-party creditors are listed on their credit report.

7        THE COURT:  Can you tell me the purpose of them being

8   handwritten in this way?

9        JOHN HODIL:  Normally -- we saw this strategy from

10  AIM.  It's mainly meant to point out the defects in

11  Portfolio's disputing system.

12       We've known from our debt defense practice that we

13  will send forms that specifically say, This is our law firm

14  letterhead.  If you don't update that, this is disputed, if

15  you continue contacting our clients, we will sue you.  Those

16  get missed.  But we sill send these handwritten ones because,

17  quite frankly, I think they have software sometimes that

18  easily picks out these disputes.

19       We also know that clients that send disputes, they're

20  not always honored.  So this way we can send our disputes and

21  track them by proof of mailing when they get there, and then

22  when we pull the next credit report, see if the dispute was

23  actually honored or not.

24       THE COURT:  I guess I'm trying to understand why they

25  are handwritten in this way.

1          JOHN HODIL:  They are handwritten -- it's just

2    another form in which to send them.  We don't want to put them

3    on letterhead because we don't have an underlying debt case.

4    So it's not like we are going to send -- reference some MDJ

5    docket number.

6          So for these, we just started sending them form

7    letters.  We got the idea from other credit repair agencies

8    that have done so with varying success.

9          THE COURT:  With respect to these particular letters

10   by Mr. Sofaly and Mr. Malcolm, those are not Mr. Sofaly or

11   Mr. Malcolm's words; correct?

12          JOHN HODIL:  No.

13          THE COURT:  Okay.  And you all got in a room and

14   decided that you were writing some of these letters and this

15   would be the contents of these letters?

16          JOHN HODIL:  Yeah.  We wanted to have a general

17   format.  We didn't want to send the same letter every time,

18   but we definitely had like 7-to-11 templates that we have that

19   we send out to various different creditors.

20          Again, when we were drafting these, Mr. Hollingsworth

21   was the one physically writing them, but Attorney Gordon and I

22   were in the room and, again, we just wanted to capture the

23   general sentiment of many of our debt defense clients.  That's

24   how we originally arrived at this, is dealing with debt

25   defense clients, listening to them, talking to them,

1   understanding their plight and trying to do something to

2   rectify, and the credit repair has certainly done that, as

3   testified by Mr. Malcolm and Mr. Sofaly.

4           THE COURT:  And so with respect to say, for example,

5   the specificity of a particular type of television set in the

6   context of both the Sofaly and the Malcolm letter, that's

7   something you guys came up with?

8           JOHN HODIL:  Yeah, it's just a machination of that.

9   It's just fluff.  That's all it is.

10          THE COURT:  Okay.  I think those are my questions for

11  you.  Thank you.

12          JOHN HODIL:  Yes, ma'am.

13          THE COURT:  Thank you.

14          Okay, Mr. Ward, I would ask if you can please come to

15  the stand.

16          JOSHUA P. WARD, having been previously sworn, was

17  examined and testified as follows:

18          MR. WARD:  Good morning, Your Honor.

19          THE COURT:  Good morning.  If you wouldn't mind

20  stating your full name for the court reporter.

21          MR. WARD:  Joshua Paul Ward, W-A-R-D.

22          THE COURT:  Okay.  Now, Mr. Ward, you are the owner

23  of your firm; correct?

24          MR. WARD:  Yeah, president and owner, a hundred

25  percent equity.

1          THE COURT:  Okay.  Very good.  And with respect to

2    this letter, these letters and the scheme that we're here to

3    talk about, tell me about how this started.

4          MR. WARD:  So Attorney Gordon has been with me for

5    about ten years -- and you became a lawyer in what year,

6    Travis?

7          MR. GORDON:  2020.

8          MR. WARD:  And he's been a law clerk since then.  So

9    he has grown into overseeing the debt defense practice, which

10   involves pretty robust FDCPA E8 practice, and he's also -- he

11   made contact with folks at AIM Financial, who actually reached

12   out to him seeing his activity on the docket for, you know,

13   FDCPA E8 cases, and they asked the firm to represent them and

14   clients jointly.

15          They're a credit repair organization, which there's a

16   few distinctions, obviously, between a credit repair

17   organization and a law firm, but nonetheless, they are an

18   agent, and they draft letters on behalf of clients, as is my

19   understanding there's lots of evidence of this type of

20   activity --

21          THE COURT:  When did you start engaging in this

22   practice, Mr. Ward?  I'll get back to the question.

23          MR. WARD:  Well, I'm trying to answer the question,

24   Your Honor.

25          THE COURT:  When?

1           MR. WARD:  So it was when AIM came to us.

2           THE COURT:  Okay.  Which was when?

3           MR. WARD:  I don't know the exact date, but I would

4    want to say that it was probably -- I was thinking it was in

5    2022, but it might have been in 2023.  It's been a very full

6    year.  So sometimes it feels like it's longer ago, but it was

7    when AIM came along.

8           And Travis enrolled those cases.  I talked to Travis

9    about those cases and, you know, I had input, and I didn't see

10   anything unusual about it or, just to be quite on the nose

11   here, certainly nothing illegal.

12          Travis prosecuted those cases in court and went

13   through discovery with some of the best lawyers that there

14   are.  Nobody ever accused Attorney Gordon or AIM or its

15   clients of doing anything wrong whatsoever.

16          So Attorney Gordon came to me in fall of 2023 and

17   said we should, you know, adopt some of these practices and

18   bring them in-house because it's repeatable and scalable and

19   it fits nicely into our bouquet of services.  And that's -- I

20   have obviously more to say, but when?  Fall of 2023.

21          THE COURT:  You're saying that Mr. Gordon is the

22   brain trust that came up with this plan?

23          MR. WARD:  Certainly it was his impetus, but I had

24   lots of oversight input, and we all talked in this -- but

25   yeah, Attorney Gordon is very sure-footed, and his practice is

1  pretty limited to FDCPA defense, and he's very competent, very

2  knowledgeable.

3         THE COURT:  And you agreed with this practice, is

4  that what you are suggesting?

5         MR. WARD:  In a general sense, yes, but if there's

6  specific -- yeah, I mean, in general, yes.  I mean, did I see

7  every stitch -- I mean, he does operate with some autonomy.  I

8  don't see every stitch of paperwork that he has drafted to

9  date.

10         But I know that your focus is the letters.  I was

11  certainly aware of the letters.  I saw some of them, and I

12  remember having a conversation with them about the prior cases

13  that they litigated and settled.

14         THE COURT:  Who is "them"?

15         MR. WARD:  My team:  Gordon and Jack and

16  Hollingsworth and Salada.  And I said you better make sure

17  that you have the agency in every one of these cases, and

18  that's not a concept that we're unfamiliar with because in,

19  you know, other parts of the business, there's -- sometimes

20  the defendants will successfully challenge, standing by making

21  sure in the rep agreements that we have specific agency to

22  dispute particular debts.

23         Again, we were never accused of any wrongdoing, but,

24  you know, in the context -- you know, obviously, I'm here, and

25  a federal judge is suggesting -- there's a member of the

1    Department of Justice here and additional magistrates.  You

2    know, people are suggesting that we've done something illegal,

3    but you have to understand, we never did this in the shadows.

4    We would never intend to do anything illegal, and we certainly

5    wouldn't intend to gleefully come into federal courts with

6    lawsuits that were premised on something illegal.

7            And when you consider that he had already

8    successfully done this with a batch of cases for a credit

9    repair organization, I think it sheds light on, you know, my

10   business judgment and my judgment as the principal of the

11   firm.

12           THE COURT:  What was the purpose of the handwritten

13   letters?

14           MR. WARD:  So a few things.  There -- so I believe

15   that Portfolio is way more likely to disregard a handwritten

16   letter.  That's probably -- the same thing with us.  If --

17   well, we're not that big.  But if you think about it, they are

18   probably going to scan the letters in, right, and then they

19   are probably going to have some OCR software look through it.

20   That's nothing illegal about that.  You know, it is --

21           THE COURT:  So let me stop you for a moment.  So they

22   are designed to purposefully sidestep the review process of

23   Portfolio?

24           MR. WARD:  In part, yes, but, you know, there's --

25   again, there's nothing wrong with that, and I'd like to

1    explain why that is.

2              THE COURT:  Okay.

3              MR. WARD:  Number one, a handwritten letter -- to say

4    that writing a handwritten letter is illegal, I don't know of

5    any court, law that would ever prohibit your right to freedom

6    of expression in that way.  Not to get constitutional on you,

7    but, okay, consider that.

8              Number two, there is a dearth of case law

9    specifically discussing E8 that talks about -- well, I'll get

10   to that in a second.

11             No. 2 is the fact that, you know, people that are

12   likely to draft handwritten letters are the people that

13   deserve the most protection under the FDCPA.

14             So if a savvy law firm and lawyer like Attorney

15   Gordon wants to test their systems to make sure that they're

16   honoring handwritten letters -- again, which are the form of

17   communications that are most likely to be made by indigent

18   folks, I say good on him.  That makes him smart.  That doesn't

19   make him a criminal.  Okay?

20             Thirdly, look at the consent orders that the Federal

21   Government, the CFPB is putting on Portfolio two times.  One I

22   think in 2012 and one in 2013.  They are supposed to be

23   looking out for this type of stuff.

24             Then there's also a dearth of case law in Portfolio

25   V. Evans, 7th Circuit, which is a case that I want to talk

1    about a lot and willing to give to the Court, and it's been

2    cited in my letter, there is no problem with the fact -- and

3    the courts have used this word, of course the letter is

4    contrived to make a violation.

5              What does a credit report organization do?  It's a

6    very limited, one-dimensional thing.  You send disputes.  You

7    check the credit reports.  They don't update it.  Bang.  E8

8    violation.

9              You could send a dispute letter written on a ham

10   sandwich with mustard, give it to Keith McGurgan, and if he

11   knows or should know that that's a legitimate dispute, they

12   have to update it.  Look at the standard in Portfolio v.

13   Evans.

14             THE COURT:  Can I ask why you don't write a letter

15   that says, "I dispute this."  Tell me about the fluff that's

16   in these letters.

17             MR. WARD:  Okay.  So again, there's case law on this.

18             THE COURT:  I'm not asking about case law.  I'm

19   asking you to tell about the fluff that's in these letters.

20   Why is it there?

21             MR. WARD:  Your Honor, please, I am being accused

22   here --

23             THE COURT:  Why is the fluff there?

24             MR. WARD:  I'm trying to answer the question, and I'd

25   like a little latitude to explain why the fluff is there.

1          THE COURT:  I'm waiting.

2          MR. WARD:  Okay.  That was a practice that was used

3     by AIM and it is -- the letters have to say something.  Right?

4     So they are designed to be nonsensical.  Right?  They are

5     designed to have opinions in there, not facts, and that's

6     something that I know that I discussed with them.  Like don't

7     put things in there where you are -- you know, where you know

8     that -- you know, you are not representing somebody who is

9     going to file bankruptcy.  You know, you are not representing

10    that somebody is in jail.  Because they all know -- I mean,

11    they are competent.  Attorney Gordon and myself, we know that

12    that changes potentially their collection tactics.

13          But, you know, putting fluff in there, talking about

14    generic, you know, goofy opinions that a handwritten -- you

15    know, an indigent person might say, like "I find this world is

16    very technically complicated" and "You're buying my debt" and

17    "I don't know who you are," well, it may be goofy, but I don't

18    think it's illegal, and I think those types of letters are

19    exactly the types of letters that need to be, you know,

20    regarded and read.

21          See, Portfolio, I guess they don't want to read them

22    and they don't want to acknowledge the dispute, doesn't make

23    me a criminal.  It doesn't make Attorney Gordon a criminal.

24          It's -- we never intended to hide that, you know.

25    And there is great case law that talks about -- the only thing

that matters under E8 is do we know the debt is disputed.  So

it's not material to any aspect of the civil case liability

and defense that the letters have a goofy tone.

THE COURT:  It might be relevant to other things,

though, like your ethical responsibilities.

MR. WARD:  It could be, and I'm prepared to address

those questions.  I really am.

THE COURT:  Okay.  With respect to the fluff, you

would concede that the fluff is not something that you

discussed at all with any of your clients, including

Mr. Malcolm and Mr. Sofaly.

MR. WARD:  And that was something that I noticed.  So

I see that Your Honor -- I believe Your Honor is keying in on

the fact that the letters, the language of the letter

pre-dates Attorney Gordon's conversation with the client.  It

certainly does in most cases; meaning, that the letter is

drafted in can, and there's a battery of them, and what you

are doing is you are matching a consumer's case to a letter.

He is going to tell you and the client --

THE COURT:  Excuse me, who is "he"?

MR. WARD:  Attorney Gordon.

THE COURT:  Okay.

MR. WARD:  And the clients will tell you that we tell

them that we are doing that.  We're telling them that we are

sending an absurd letter -- I'd like the record to reflect

1    that my client is nodding his head.

2              We tell them that we're going to send an absurd,

3    goofy letter.  We tell them it's part of the strategy.  It's

4    in the record manuals.  As long as you have agency to do it,

5    the fact that you are assisting a consumer in drafting a goofy

6    letter, no problem.

7              You know, it's like that chicken or the egg.  It

8    doesn't matter.  It's a canned letter.  He's saying, Here,

9    this is what we're going to send for you.  Do I have your

10   authorization to do it?  And they see it.

11             So, you know, this whole thing about the TV, I got to

12   tell you -- and I purposefully kept my distance from these two

13   clients because I never wanted there to be any suggestion that

14   I was coming in after the fact trying to clean this up.  I

15   knew what they were doing in a general sense.  I wasn't

16   involved in these two cases.  He's beta tested this, Attorney

17   Gordon, and I trust him.

18             And this whole thing about the TV, you know, that

19   is -- I think that you are going to learn that that, you know,

20   TV aspect, number one, has no bearing on the civil case, but,

21   you know, nor would it affect how Portfolio would handle this

22   thing, but I think that that's just, you know, part of the

23   form letter.

24             THE COURT:  So you sent a letter representing that it

25   came from someone it did not come from; correct?

1    MR. WARD:  I absolutely disagree with that.

2    Principals of agency.  Right?  If he has agency to write and

3    do exactly what he did, then he is the consumer, and I have

4    case law here under the FDCPA that talks about that.  Not to

5    mention AIM did it.  Right?  AIM --

6         THE COURT:  We are not here to talk about AIM.

7         MR. WARD:  Well, this is my answer.  Other credit --

8    this is a practice that is not unique to me.  Not unique to

9    Attorney Gordon.  We didn't invent it.  It is employed by

10   credit repair organizations all the time.

11        THE COURT:  And this, just so I understand, is to

12   generate lawsuits, is it not?

13        MR. WARD:  Yes.  And again, there's no problem with

14   that.  But I want to finish answering that question because if

15   you are saying that I'm misrepresenting -- now, it would be

16   true that he -- and by the way, I never sent any letters, but

17   I understand it's my firm and I understand how vicarious

18   liability works, and I'm responsible for every one of these

19   people.  I have had this firm for nearly a decade.  I get

20   that.

21        But it would be true to say that if you draft, write

22   and sign a letter in this fashion and you didn't have the

23   agency, then the answer to your question would be in the

24   affirmative.  But because you have the agency specifically to

25   do exactly what you are doing, every single stitch in that

1    letter, when that agency is established in writing and orally

2    as it is, it's absolutely fine.

3            THE COURT:  You'll agree, Mr. Ward, if you send me a

4    letter and it's signed by you, I have every reason to assume

5    that that letter came from you; correct?

6            MR. WARD:  Obviously.

7            THE COURT:  Okay.  So presumably when Portfolio gets

8    a letter from an individual, they have every reason to assume

9    it came from that individual, the signature is that of the

10   individual; correct?

11           MR. WARD:  Well, here's the thing, when you -- and I

12   have researched the law on this.  When a consumer authorizes

13   you to sign a letter as a lawyer, you can do it.

14           THE COURT:  That's not what I'm asking you.

15           MR. WARD:  So it is their signature in point of fact.

16   I mean, it if they're saying "sign my name," that is their

17   signature.  It's genuine.

18           THE COURT:  And the contents of the letter you would

19   say as well?

20           MR. WARD:  Well, because you have the agency.  Now,

21   you take away the agency and you don't obtain the client's

22   authority -- I mean, that's why paragraph 6 in the rep

23   agreement says what it says, and that was something that I

24   told him.  I was like you -- I said -- not thinking of the

25   court, thinking of the Department of Justice certainly not,

1    but thinking about people like Lauren Burnette, I said I know,

2    you know, where the pinch points in these cases are.  You

3    better make sure you have the agency like you did in those

4    prior cases.  So you put it expressed in that rep agreement.

5            THE COURT:  So you'll agree with me, Mr. Ward, that

6    the contents of those letters, some of which are sitting in

7    front of you if you care to thumb through them, aside from the

8    dispute, they're false?

9            MR. WARD:  No.

10           THE COURT:  They're true?

11           MR. WARD:  Well, here's the thing, Your Honor, with

12   the agency -- it would be false if you didn't have the agency.

13           THE COURT:  I'm asking you whether the contents of

14   the letters that you supplied, whether it be to Portfolio or

15   any of the other agencies listed there -- and again, feel free

16   to thumb through them -- whether the contents, other than the

17   dispute, are false?

18           MR. WARD:  Categorically, no.  Unless you were to

19   somehow find out that these guys went rogue and started

20   letters on behalf of people who were not their principals and

21   they were not their agent.

22           THE COURT:  I'm not asking whether agency exists.

23   I'm asking you whether the contents of the letters are false.

24           MR. WARD:  I believe -- these two gentlemen have

25   testified that they -- these are opinions.  They are opinions.

 1    Right?

 2              THE COURT:  So you believe that those are opinions --

 3              MR. WARD:  Well --

 4              THE COURT:  -- of Mr. Sofaly and Mr. Malcolm that are

 5    identical opinions that have been supplied to Portfolio and

 6    the other agencies?

 7              MR. WARD:  Please restate that question, Your Honor.

 8              THE COURT:  So you are suggesting that the contents

 9    of those letters are opinions that apparently identical to

10    Mr. Sofaly and Mr. Malcolm that are supplied to Portfolio and

11    these other entities?

12              MR. WARD:  You know, opinions, like a lot of other

13    things, can be shared.  And when you say, "Hey, client, do you

14    share this opinion," you are probably going to get that answer

15    from anybody, any of these clients.

16              These opinions that are put in here -- again, not

17    material facts designed to alter or mislead --

18              THE COURT:  Well, tell me what the opinions are.

19              MR. WARD:  Well, you're right, I haven't examined all

20    of these specifically, but, you know, I -- and I believe, you

21    know, he knows and Mark knows, and they all know that when

22    they are drafting these, I told them -- you know, we

23    definitely talked about -- and certainly at the AIM stage --

24    you know, tell everybody, like don't go putting things in here

25    like, you know, facts like about bankruptcy and about --

1        THE COURT:  What are the opinions in the letters?

2        MR. WARD:  I believe they are generic opinions about,

3    you know -- well, like this one, for instance, like society

4    or, you know, generally -- they are just nonsensical.  So they

5    are like of no import, really.

6        THE COURT:  Do your clients have nonsensical opinions

7    that they shared with Portfolio and others?

8        MR. WARD:  Well, you could say that, but there's

9    nothing illegal about a consumer expressing an opinion in a

10   dispute letter under E8.

11       THE COURT:  Okay.  Thank you, Mr. Ward.  You can step

12   down.  I guess, Mr. Gordon, you are in the hot seat now.

13       <u>TRAVIS ANDREW GORDON</u>, having been previously sworn,

14   was examined and testified as follows:

15       THE COURT:  I'm not sure if you took the exhibits

16   from --

17       MR. WARD:  You want them?  Oh, yeah, I sure did.  And

18   again, I didn't have a chance to review all of those, but.

19       MR. GORDON:  Good afternoon, Your Honor.

20       THE COURT:  Good afternoon.  If you could please

21   state and spell your name for the court reporter, Mr. Gordon.

22       MR. GORDON:  Travis Gordon, G-O-R-D-O-N.

23       THE COURT:  Okay.  And, Mr. Gordon, tell me about

24   these letters.

25       MR. GORDON:  Sure.

1     THE COURT:  Apparently you are the creator.

2     MR. GORDON:  Well, I don't know if I was the creator,

3  but I definitely oversaw them and reviewed them, Your Honor.

4     A little bit refreshing what Attorney Ward said, you

5  know, I was dealing with other companies that were doing this.

6  I carried this practice through.  Involved in discovery.

7  Disclosed all of this through those processes.  It seemed like

8  a good -- not only a good, you know, business move, but also,

9  we get a lot of clients that get sued by these debt

10  collectors.  They have not great credit reports.  It was just

11  another service we could offer them to help them clean up

12  their credit report, and I have had a lot of -- you know, I

13  spend most of my time on the phone with clients.  But small

14  debts, you know, they cause a lot of problems for them, cause

15  a lot of problems getting loans, and I was actually really

16  excited to say, Hey, I think I can do something that can

17  really help these people out.  So I basically just started off

18  by trying to replicate those processes that I had already

19  seen.

20     I understand Your Honor's issues with some of that

21  wording.  My thought was always -- and I would explain this to

22  the clients -- we are going to do a handwritten letter.  It's

23  going to look like it's coming from you.  There's going to be

24  a lot of superfluous language in there.  We'll talk about the

25  weather, but we're going to make sure we communicate that

dispute, and we made sure that is sent over.  If we're going
to order a credit report again, we audit it.  We have varying
results that we keep close with and track, and that's a lot of
what Jack Hodil does, the data there, and we have gotten great
results for the clients, and they have always been really
happy with our work.

First time ever hearing there's some issue with this.
We have looked over it.  We have talked to other counsel.
Sitting here today, I don't believe there's anything improper
about what I did.  But I'm obviously -- you know, this is
something I became passionate about.  In law school I never
thought I would be doing debt.  I'll fight a debt for a client
for $600.  They have tears in their eyes.  It's a lot of money
to them.

I'm proud to be able to do this work for my clients.
I'm proud to be able to offer this service to the citizens of
PA who are not financially well off, and I think that whatever
issues there may be here that we are not seeing, I believe
they could be resolved, and it could be as easy as just, you
know, sending these to the clients themselves to have them
sign with rep agreements.

But that's where it all started and how the letters
came in.  I sat down with Mark initially to draft some and
review them.  Once we had a couple good templates, we
started -- we offer it now with our representation to these

1   clients when they call us to defend a lawsuit.  But at the

2   time, we just called them and sent separate agreements for

3   credit repair, and the process just kind of started going.

4           And we have had questions.  I think they have all

5   been answered as far as the agency and how far we can go with

6   that, but I'm here to say I think it's a great service for the

7   people of this state that have trouble getting their credit

8   scores up, and I am one hundred percent willing to do whatever

9   we have to do to make sure that we are in compliance with

10  everything and everything is aboveboard.

11          THE COURT:  And so the purpose of burying the dispute

12  in what has been called "the fluff," is an effort to have the

13  agencies report on these.

14          MR. GORDON:  Well, see, I would argue that they have

15  to read them.

16          THE COURT:  So you are testing the agency?  Is that

17  what you are doing?

18          MR. GORDON:  Sure.  And I think as far as it's a

19  brand-new practice, so we're collecting a lot of data.  I

20  think that what we're trying to do here is strategize and do

21  what's best for the client and let's get the best result for

22  the client.

23          Now, I would say these letters are -- they take a

24  minute to read.  I know what the duties and obligations of

25  these debt collectors are.  I find it a pretty odd argument to

1      say these debt collectors can't read a one-minute paragraph.

2      You are confusing them.  You know, it just -- I don't buy

3      that.

4                  THE COURT:  But you know that you are; right?

5                  MR. GORDON:  Well, I think that if a one-minute

6      letter confuses a debt collection agency, then they are the

7      ones that need to review their processes to make sure that

8      they are paying full attention to these dispute letters they

9      are receiving.

10                 THE COURT:  Joungsun, if you wouldn't mind.  I want

11     to represent this is a document that was provided to the Court

12     by your firm, by Mr. Ward, and by you I believe; correct?

13                 MR. GORDON:  Yes, Your Honor.

14                 THE COURT:  Okay.  And it's an agreement for credit

15     audit and repair; correct?

16                 MR. GORDON:  Yes, Your Honor.

17                 THE COURT:  I'll just turn your attention to

18     paragraph 3 of this agreement.  It says, Client agrees to give

19     law firm agency to use their personal information in

20     processing disputes to the third-party creditors, including

21     agency, to send the handwritten letters to third-party

22     creditors styled as though they were sent from the client.

23     This greatly increases the chances that creditor will violate

24     State and Federal laws, as handwritten letters are often

25     overlooked and cannot be scanned into and processed by

1    software employed by creditors to detect disputes.

2            Can you tell me about that?

3            MR. GORDON:  Yes, Your Honor.  I believe that we

4    recognize that there's some shortcomings in the debt

5    collection agency's dispute processes, and we strategize with

6    our client to get them the best result with our services.

7            THE COURT:  So your intention is not really to

8    dispute the debt?

9            MR. GORDON:  I always tell clients there's three

10   outcomes.  A lot of times we find that when debt collectors

11   receive these letters, they just remove the trade line.  We

12   have had some clients that's been really great for.  They have

13   had, you know, over $10,000 just fall off their credit report

14   by receiving dispute.  So that's one outcome.

15           Another outcome is that they will read the dispute,

16   as a lot of them do.  When we send these letters, they do pick

17   them up and they do report them as disputed.

18           THE COURT:  But that's not your purpose in this, is

19   it?

20           MR. GORDON:  I would say my purpose is to give the

21   client the best result and that is one of the results.  So it

22   is a purpose.

23           THE COURT:  It is your purpose to obscure the

24   dispute?

25           MR. GORDON:  The purpose to obscure -- I would say

1    that the purpose is to dispute the debt and then to see

2    whether or not they report that dispute.

3              THE COURT:  You can easily write a letter that says,

4    "I dispute this debt.  Signed Robert Sofaly."  You didn't do

5    that; correct?

6              MR. GORDON:  No, we didn't.

7              THE COURT:  Okay.  I'm trying to understand why.

8              MR. GORDON:  Your Honor is correct.  I mean, it is a

9    way we think that these creditors won't do their due diligence

10   and will miss these disputes, which is beneficial to the

11   client.

12             THE COURT:  And you'll agree with me that aside from

13   the debt language, what little debt language there is in these

14   letters, the rest of the letter is concocted, it's not true.

15             MR. GORDON:  Well, I think a lot of that letter is

16   just superfluous language.

17             THE COURT:  Is it concocted and untrue?

18             MR. GORDON:  I don't know if I would call it untrue.

19   I think a lot of the sentiment in there is what a lot of our

20   clients feel generally, but if you were to say, you know,

21   specifically did I have a conversation with the client and

22   these were their exact words, in that sense, you know, it's

23   not true.

24             THE COURT:  All right.  Those are all the questions I

25   have right now.  I recognize, Mr. Ward, that you might have

1    some desire to put something on in a primitive way.  I don't

2    know if that's true or not.

3              MR. WARD:  It is, Your Honor.

4              THE COURT:  Okay.  So what we're going to do now is

5    take a break.  We will regroup at 1:15 and we'll hear anything

6    more that you have to say.

7              MR. WARD:  Point of order, Your Honor, how much time

8    do we have reserved for this hearing, just so I am cognizant

9    of that?

10             THE COURT:  We will go -- what's our next one,

11   Joungsun?  Is it 2:30?

12             THE DEPUTY CLERK:  Yes, 2:30, Judge.

13             THE COURT:  So we'll go until 2:30.

14             MR. WARD:  And we reconvene?

15             THE COURT:  At 1:15.

16             MR. WARD:  Okay, Your Honor.

17             THE COURT:  Okay.  Thank you.  Stand in recess.

18             THE DEPUTY CLERK:  All rise.  This Honorable Court is

19   now in recess.

20   (Court was recessed at 12:25 p.m.)

21                          (In Open Court)

22             THE COURT:  Okay.  Be seated.

23             MR. SCHULZ:  Your Honor, before we get started, I

24   have a flight at 3:40, and I was wondering if it would be

25   okay, Your Honor, if I left around two.

1      THE COURT:  Well, before you leave, I will ask both

2  of you, and before I turn to Mr. Ward, Ms. Burnette as to you

3  first -- and everybody remains under oath -- what do you know

4  about this, I'll call it "scheme"?  If you can speak directly

5  into that microphone.

6      MS. BURNETTE:  Yes, Your Honor.  Can you hear me

7  okay?

8      THE COURT:  I can.

9      MS. BURNETTE:  Thank you.  My role is to represent

10  Portfolio Recovery Associates in FDCPA suits.  I first learned

11  that these letters were coming from Mr. Ward's firm the day of

12  the Rule 16 conference when Mr. Schulz shared that with me.

13      We had a case prior.  Your Honor, has one of the

14  letters.

15      THE COURT:  Because you thought they were coming from

16  a creditor, a collection --

17      MS. BURNETTE:  I thought they were coming from AIM

18  Financial, yes, Your Honor.

19      THE COURT:  Okay, very good.

20      MS. BURNETTE:  And my -- well, I thought they were

21  coming from AIM Financial and now I know that they weren't

22  beginning what looks to be around August 1 of 2023.

23      I have for Portfolio Recovery 23 different matters

24  that have been filed of record.  I have not been retained in

25  all of them in full disclosure.  I count five or six versions

1    of the letter.  I have found one that was a solo letter;

2    meaning, I didn't find any duplicates.  But the rest, we have

3    seen multiples.  And if Your Honor has any questions, I'm

4    happy to answer them.

5            THE COURT:  Well, with respect to these letters in

6    particular, has that never been the point of any discovery?

7            MS. BURNETTE:  It has.  And it was the Stephon Talton

8    matter in which discovery showed that AIM Financial was the

9    credit repair organization who was preparing and mailing these

10   letters.  AIM Financial was added as a plaintiff to that case

11   and responded to some written discovery.  The matter ceased at

12   EME.

13           THE COURT:  Okay.  Do you have anything that you need

14   to add?

15           MR. SCHULZ:  Same as what Ms. Burnette said.

16           THE COURT:  Okay.  Well, then you can certainly catch

17   your flight.

18           MR. SCHULZ:  Okay.  Do you mind if I stick around

19   until then?

20           THE COURT:  Whenever you need to leave, you can

21   certainly leave.

22           MR. SCHULZ:  Thank you, Your Honor.

23           THE COURT:  Okay.  Mr. Ward, anything you would like

24   to provide to the Court?

25           MR. WARD:  Thank you, Judge.  I feel like I'm playing

1  catch up.  Do I understand that what has happened here in the

2  most plain sense is that Ms. Burnette put the Court on notice

3  that she thought that we were -- that all of these cases

4  somehow involved AIM and we weren't disclosing that?

5           THE COURT:  No.

6           MR. WARD:  Okay.  So, quite candidly, I had a lot

7  more prepared to talk about the FDCPA and the common

8  practice -- practices that are common to the industry and what

9  types of things we see in the courtrooms --

10          THE COURT:  When you say "the industry," what

11  industry?

12          MR. WARD:  Well --

13          THE COURT:  The legal industry because that's the

14  only thing I'm concerned about here.

15          MR. WARD:  I understand that.  So there's credit

16  repair organizations --

17          THE COURT:  And that's interesting, but you are a

18  lawyer practicing in this jurisdiction.  I'm asking if you

19  have some information suggesting that lawyers are permitted to

20  do what you've done, then I'm happy to hear it.

21          MR. WARD:  Well, Your Honor, we do, and I was

22  prepared to make oral argument on that, and I even wanted to

23  maybe cross-examine a witness.

24          However, it occurs to me that a number of things have

25  been surprising about these proceedings, and I find myself --

1    I note that -- you know, I have been informed that I guess a

2    member of the Justice Department is here.  So that gives me

3    pause.  I mean, there's other magistrate judges and audience

4    in the gallery and --

5                THE COURT:  This is a public courthouse, Mr. Ward.

6                MR. WARD:  I understand that, Your Honor, I certainly

7    do, and I respect every single person in this courtroom and

8    particularly you, Your Honor.  I respect the practice of law

9    as well.

10               You know, the only reason I was talking about the

11   industry is because the FDCPA, that's what I mean, the

12   practice of FDCPA law, there's a whole economy surrounding it,

13   and I think we can demonstrate in a more cool and calm fashion

14   through briefing rather than my flustered testimony where it's

15   very adversarial, but I would like to have some notice at this

16   late stage, and I feel that this is a pretty late stage for me

17   to be asking for the first time what are the precise nature of

18   the Court's inquiry and what's going on?

19               Maybe there's a number of things that we agree upon?

20   Maybe there are certain facets of this that -- you know, the

21   substantive law, certainly informs the other aspects of it,

22   but I would like to, you know, assert the right of my clients,

23   myself, Attorney Gordon, everybody for procedural due process,

24   and I ask the Court to issue a briefing schedule.

25               I also -- you know, I have an ethics attorney present

1    here today, and I've gotten some opinions, and I would like

2    those to be shared.

3            THE COURT:  There have been no proceedings against

4    you at this point, Mr. Ward.  At this point, I am on a fact-

5    finding mission to find the facts.  If you have some more

6    facts you'd like to present, I'm happy to hear them.

7            MR. WARD:  So one of my requests for -- this is

8    totally unchartered water for me, Your Honor, I apologize.

9            THE COURT:  Me too, Mr. Ward.  This is the first time

10   in all of my career that I have had this happen.

11           MR. WARD:  Well, it would be -- wouldn't it be

12   helpful and wouldn't you agree that it's everybody's right to

13   know what we're being accused of, if anything?

14           THE COURT:  You don't know?

15           MR. WARD:  Not particularly, Your Honor, I do not,

16   no.

17           THE COURT:  Okay.  Well, I am here to explore the

18   nature of the letters that you have been supplying to

19   Portfolio.

20           I'm here to understand whether the plaintiffs that

21   you have brought into my court had any knowledge of these

22   letters which we have explored today.

23           I'm here to explore the truth or fiction of these

24   letters and the purpose behind them, and that's what I'm here

25   to do, and that is my authority managing both of these cases,

and it is my authority and, frankly, my duty as a judge here
on this court to have a sense as to whether or not you have or
you have not acted ethically with regard to your
representations made to this body.

MR. WARD:  Okay.  I would prefer to submit a written
brief that would talk about the standards and talk about E8
and why this is all permissible.

If the Court is not going to let me do that, I can
attempt to articulate it and cite to cases.

THE COURT:  Well, I want to be clear that you have an
opportunity to present whatever you want to present here
today.  You knew we were having this hearing.  You clearly
knew what it was about given the flurry that followed my
notice of this hearing, as well as my invitation to all of the
participants in this hearing.

So I have no sense that you weren't fully aware of
why you were here.  You know also what happened at the Rule 16
conference where Mr. Gordon apparently revealed for the first
time to anyone that you all were behind these letters, which
obviously gave me pause, and I indicated that to Mr. Gordon,
too.  It was not some vague consternation, as you all put it
in your letter.  It was very explicit.  And so as to why you
were here, everybody knows why you are here.

So you are given an opportunity right now to present
this.  If you prefer to submit something to me, that's fine.

1    I'm happy to look at whatever you submit.  You'll have until

2    Friday of this week to submit it.  But just know the Court, as

3    well as the Board of Judges as a whole, will be exploring

4    whether or not any ethical transgressions have occurred here.

5         What Department of Justice does is their business.

6    Not mine.  But as to this court, we have an obligation to make

7    sure that the attorneys who practice before them are upright

8    in their representations and that they do not engage in fraud

9    on the Court.

10        And so to the extent that that has happened, if it

11   has, we have this record to determine that, and if there's

12   more that you would like for us to see, I'm happy, as I said,

13   to entertain that, but please know that this is going to be

14   fully explored by the entire Board of Judges.

15        MR. WARD:  I appreciate all of that clarity, Your

16   Honor, and I do acknowledge and agree with much of what you

17   said.

18        I do think for the purpose of everybody, that I'll be

19   far better understood in a brief than I would here, and I

20   don't want to waste anybody's time with what would be

21   duplicative.  So thank you for that opportunity, Your Honor.

22   We would also request an expedited copy of this transcript.

23        THE COURT:  You can certainly take that up with our

24   court reporter.  Absolutely.

25        Anything more for the record here?

1          MR. WARD:  A moment, Your Honor, to confer.

2          THE COURT:  Sure.

3     (Pause noted)

4          MR. WARD:  A point of order and a request, Your

5     Honor.  I think that, you know, given the nature of the

6     inquiry, that we need to have a better record, and I would

7     like to have the opportunity to present the testimony of an

8     ethics expert, and if we have a briefing schedule by Friday,

9     that's not going to be possible.  So we would ask for an

10    additional hearing so that we could put on --

11         THE COURT:  Well, again, you do not stand accused of

12    any ethical violations.  There is a process by which those

13    things happen, and those are the situations where you may

14    defend against any such charges.

15         MR. WARD:  As the Court pointed out, though, you have

16    independent discretion to exercise your own discipline even if

17    the -- I'm flustered -- the PA Board of Ethics does not, and

18    I'm unfamiliar with all of this parlance.  I don't want to use

19    any words incorrectly.  Indictment?  Investigation?  This is

20    certainly something -- this is an unconventional hearing, and

21    all I'm asking is that I think I should be afforded the

22    opportunity from a procedural due process standard to present

23    in full relief the expert testimony of, you know, a witness

24    who I believe will diminish wholly any suspicions and shed

25    light on areas of the law and considerations that would

1    certainly be helpful and beneficial to all.

2              THE COURT:  And as I understand, that individual is

3    here right now?

4              MR. WARD:  An ethics attorney is here.

5              THE COURT:  Please feel free to call him.

6              RYAN JAMES:  May it please the Court, Ryan James on

7    behalf of the J.P. Ward law firm, Your Honor.  May I step

8    forward to the bar?

9              THE COURT:  Yes.

10             RYAN JAMES:  Your Honor, I'm a practicing member of

11   this court in this district wearing my ethics hat.  I'm

12   generally here in a different capacity.

13             THE COURT:  Okay.  I'll ask if you can take the stand

14   then, sir.

15             RYAN JAMES:  Sure.  Your Honor, I --

16             THE COURT:  Let's wait until we get to the stand.

17             Joungsun, I don't believe he has been sworn.  If you

18   don't mind swearing him in.

19             THE DEPUTY CLERK:  Would you raise your right hand,

20   please.

21             RYAN JAMES, a witness herein, having been first duly

22   sworn, was examined and testified as follows:

23             THE DEPUTY CLERK:  You may lower your hand.

24             THE COURT:  If you can please state and spell your

25   name for the court reporter, sir.

1        RYAN JAMES:  Ryan James, J-A-M-E-S.

2        Your Honor, my intention here is in being an advocate

3    and wearing an ethics hat and providing ethics counsel to

4    Mr. Ward.

5        As part of that counsel and having watched what

6    transpired today, seeing the Court's orders that came down, I

7    don't take dispute that this Court, the federal court, this

8    district court separately issues a license and can govern

9    attorney conduct before it and can make an inquiry in that

10   regard.

11       Prior to coming in, and in consultation with

12   Mr. Ward, one of the looming questions is what's the potential

13   rule of professional conduct that's at issue, without getting

14   into too much confidentiality?  That was up in the air.

15       So as these proceedings have gone on and the witness

16   testimony came out, certain things start to crystallize.

17       I think what's most important for my client, for the

18   firm, is understanding from a notice perspective what

19   particular rule violations this court and the Board of Judges

20   is making inquiry into so that Mr. Ward on his behalf, on

21   behalf of his firm, not necessarily engaging me, right,

22   because I'm now here as an advocate.  It would probably need

23   to be somebody separate that can render an expert opinion to

24   let Mr. Ward --

25       THE COURT:  So you are not the expert who Mr. Ward

1       would call, is that what you're suggesting?

2               RYAN JAMES:  I think at one time before I just took

3       this posture, that I would have potentially been that expert,

4       and I could serve as that, but now that I'm here kind of in

5       this advocate's role, it blurs that line.

6               I think what Mr. Ward needs, perhaps with one of my

7       colleagues, is to come in here, understanding the Court's

8       focused inquiry on what issues are available and to have

9       somebody come in with experience in this area, to apply their

10      expertise and opinion to the facts and the record that's been

11      laid out.

12              So the Court's setting a briefing schedule within

13      four days from now makes it difficult to give the Court a

14      substantive opinion that can touch upon things.

15              The additional concern that I have for Mr. Ward in

16      providing ethics advice, this Court being one jurisdiction

17      that can govern attorneys and practice before it, is that

18      Mr. Ward has a property interest in his license with the

19      Pennsylvania Supreme Court, and as these proceedings unravel

20      and if a referral is made to the Office of Disciplinary

21      Council, Mr. Ward needs to not be in the chair here today as

22      he was, essentially acting as his own lawyer, which isn't in

23      his interests, but having somebody else that can protect those

24      interests with an objective view.

25              So if this crosses over to the Office of Disciplinary

1   Council, that's something separate in a separate jurisdiction,

2   but these proceedings that are occurring here today, given

3   that everybody was under oath, can certainly be used and that

4   could impact Mr. Ward's license.

5          So my concern in coming up here, right -- I

6   appreciate that the Court swore me -- it's more or less

7   wearing an advocate, an ethics hat that Mr. Ward needs to be

8   given a sufficient amount of time, to expedite this

9   transcript, produce it for review by independent counsel and

10  to come in here and to put on his side of the case.

11         He certainly, as best as he could given these orders

12  coming down last week, has made arrangements to have his

13  clients here, his staff here and whatnot, but getting somebody

14  else involved who can narrow in on the issues of what rules of

15  professional conduct are we dealing with?  What's the Court's

16  particular concern?  Is it a matter of frivolity?  Is it a

17  matter of fraud?  Is it a matter of deceit?  Is it a matter of

18  agency?  Competency?  A whole host of things?

19         I think he needs to have a level -- right now, he's

20  flying in the dark, so to speak, and there needs to be a more

21  narrow avenue for somebody to look at and to give you an

22  opinion.

23         So on his behalf, what I think would be prudent --

24  and, Your Honor, you're the judge.  Right?  What I think would

25  be prudent to protect his substantive and procedural due

process interests is allowing him to kind of take a minute,

reassess, get some professionals here that can sit where he's

at, represent him as a client, and to put on a presentation on

his behalf that can then be briefed to touch upon rules of

professional conduct that are concerning to this Court.

Why I started off with saying, you know, I'm here

wearing an ethics hat, my practice here primarily is doing

criminal defense work.  So, you know, as I'm observing and I

see a federal judge Mirandize essentially everybody or at

least say, "Hey, you have the right to remain silent," it then

raises different issues that I'm familiar with in the back of

my mind given my substantive practice area, but he needs to

know that because if this was essentially clients walked in

here, they took an oath, and if they perjured themselves --

I'm not saying that's the case -- that creates different

issues for him from an ethical perspective.

So I guess what I'm asking here under oath is for the

Court to indulge Mr. Ward to have some additional time, put

his ducks in a row, and to put on a more -- this isn't

demeaning to him -- put on a more professional presentation

where he can distance himself from this, because having a guy

who is currently representing himself in this capacity, his

demeanor and him feeling under attack is going to affect how

he comes across to you in the credibility assessments that you

are going to make.  So that's my ask on behalf of my client,

1    Your Honor.

2         THE COURT:  Thank you.  I appreciate that.  I had

3    been under the impression that you were to be the expert and

4    that's why you were sworn in.  You can step down.

5         RYAN JAMES:  Thank you, Your Honor.

6         THE COURT:  With respect to this, I say again, that

7    at this juncture, this Court has not instituted any

8    disciplinary proceedings against Mr. Ward.  Mr. Ward will have

9    a full opportunity to present anything should that be the

10   case.

11        Nevertheless, just to put things in perspective for

12   you, Mr. Ward, Rule 1.2D indicates:  A lawyer may not counsel

13   or assist the client to engage in criminal or fraudulent

14   conduct.

15        Comment 10 to that rule reads:  A lawyer is required

16   to avoid assisting the client, for example, by drafting or

17   delivering documents that the lawyer knows are fraudulent or

18   by suggesting how the wrongdoing might be concealed.

19        Rule 3.1, Comment 1:  A lawyer has a duty not to

20   abuse legal procedure.

21        Rule 3.3:  A lawyer has a duty of candor to the Court

22   and may not knowingly make a false statement of material fact

23   or fail to correct such a misstatement or offer evidence that

24   the lawyer knows to be false.

25        Comment 2 to that:  Lawyers have a special duty as

officers of the court to avoid conduct that undermines the integrity of the adjudicative process and must not allow the court to be misled by false statements of fact or by evidence that the lawyer knows to be false.  A failure to make a disclosure can be the equivalent of an affirmative misrepresentation.

A lawyer may not ignore an obvious falsehood and knowledge that evidence is false can be inferred from the circumstances.

Rule 3.4B:  A lawyer has a duty of fairness to opposing parties and counsel, including the duty not to falsify evidence.

Rule 8.3:  It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

Those are some of the rules.  Okay.  All right. Having said that, if you need additional time, the Court is willing to entertain not this Friday, but the following Friday for any submissions that you wish to make.

As I said, you do not stand accused as of yet of any of those things.  That is a decision to be made in converse with the rest of the judges of this court.

MR. WARD:  Thank you, Your Honor.  So do I understand that we will not have the opportunity to put on an ethics expert?

1        THE COURT:  An ethics expert, if you need one, would

2   only come into play, it would seem, if you were accused of any

3   ethical violation.

4        MR. WARD:  I see.

5        THE COURT:  Today was my factfinding mission.  Again,

6   if you have any facts that you would like to supply, either

7   you or Mr. Gordon for that matter, you should feel free to do

8   so.

9        We are going to take a brief break, though.  If we

10  can just break for about 10 minutes to recess and we can come

11  back.  We'll resume in ten minutes.

12       THE DEPUTY CLERK:  All rise.  This Court is in

13  recess.

14  (A recess was taken.)

15                    (In Open Court)

16       THE COURT:  Okay, be seated.  A couple of

17  housekeeping items.

18       With respect to the submission received last week

19  from Mr. Ward's firm, I believe it was under the signature of

20  Mr. Gordon, that information will be placed on the record in

21  each of the two cases.  It will be placed under seal in light

22  of the fact that it could have the tendency to reveal

23  attorney-client privilege.

24       As to the two pending matters, Sofaly and Malcolm,

25  those two cases will be administratively stayed at this

juncture pending the resolution of some of the issues in this case.

As to whatever it is you would like to submit, Mr. Ward, for the court's perusal, please do so at both the Sofaly and Malcolm numbers, and we will certainly take a look at those.

I have confirmed in terms of the process that unless and until you are accused of an ethics violation by this court, which has attended to it lots of process, you know, the ethics guru that you intend to call is not really -- this is not the juncture of the case where that would be necessarily relevant.

As to whether the court, whether the court be me, decides that you have engaged in sanctionable conduct in this particular case, to the extent that the court determines that there's an issue there, it would certainly be a show cause order that would go out for you to respond to.  Okay?

MR. WARD:  Yes, Your Honor.

THE COURT:  All right.  Any questions about that?

MR. WARD:  No, Your Honor.

THE COURT:  Okay.  And is it the case that you intend to file something in Sofaly and Malcolm at this juncture?

MR. WARD:  Absolutely, Your Honor.

THE COURT:  Okay.  Very good.  So we will look for that by next Friday.

1          Anything more from you, Mr. Ward?

2          MR. WARD:  Not at this time, Your Honor.  Thank you.

3          THE COURT:  Okay.  Anything more, Ms. Burnette?

4          MS. BURNETTE:  No, Your Honor.  Thank you.

5          THE COURT:  Okay, we'll stand in recess.

6          THE DEPUTY CLERK:  All rise.  This Court is now in

7    adjourned.

8                    C E R T I F I C A T E

9          I, VERONICA R. TRETTEL, RMR, CRR, certify that
     the foregoing is a correct transcript from the record of
10   proceedings in the above-entitled case.

11

12   _\s\ Veronica R. Trettel____        02/21/2024_____
     VERONICA R. TRETTEL, RMR, CRR        Date of Certification
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25