# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT SOFALY,

                 *Plaintiff,*

    v.

PORTFOLIO RECOVERY
ASSOCIATES, LLC,

                 *Defendant.*

Civil No.: 2:23-cv-02018

---

DAMIEN MALCOM,

                 *Plaintiff,*

    v.

PORTFOLIO RECOVERY
ASSOCIATES, LLC,

                 *Defendant.*

Civil No.: 2:24-cv-00053

## BRIEF IN SUPPORT OF J.P. WARD & ASSOCIATES' POSITION OF PROFESSIONAL CONDUCT

The undersigned submits this brief in support of J.P. Ward &

Associates' position of its professional conduct in the above cases:

## I.   INTRODUCTION

These cases originally began as state actions, which were removed to this Court.  ECF 1.[1]  Each suit alleges violations under the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692-1692p, namely that Portfolio Recovery Associates communicated "credit information which is known or which should be known to be false," and it failed "to communicate that a disputed debt is disputed."  15 U.S.C. § 1692e(8).  This is known as an "e(8) claim."

Each of these cases on their face appeared as run-of-the-mill e(8) cases.  The trajectory of each of these cases, however, took a turn after the Initial Case Management Conference, where the Court learned that each plaintiffs' dispute letters–identical in content–were drafted by plaintiffs' counsel, J.P. Ward & Associates (JPWA).  From that point, the Court set out on a "fact-finding mission" to fulfill what it perceived was its duty to determine whether JPWA "acted ethically with regard to [its] representations made to this body," *i.e.* the United States District Court for the Western District of Pennsylvania.  *See* Pretrial Hrg. (P.H.), 2/20/24, at 58-59.

---

[1] ECF cites will first be to the *Sofaly* case, since it was filed first, then to the *Malcom* case.  In this instance, ECF 1 is the proper citation for both cases.

On February 20, 2024, the Court, not prompted by any complaint of a party or counsel, convened a hearing, *sua sponte*, for its stated purpose.  ECF 16; ECF 4.  The Court opened the hearing by acknowledging its "inherent authority to supervise the conduct of attorneys admitted to practice before it," then it took the unusual step of placing every attorney under oath and partially *Mirandizing* each prospective witness.  P.H. 4-5.  Only at the end of the hearing did the Court "put into perspective" for JPWA "some of" the Rules of Professional Conduct that was the subject of its inquiry.  P.H. 67-68.

This brief, consistent with the leave granted by the Court at the end of its self-directed hearing, *see* P.H. 68, now makes response to the process that's unfolded thus far, as well as to the particular Rules of Professional Conduct (RPC), which the Court perceives to be at issue.  A brief recitation of some material facts are first in order.

## II.   CONCISE STATEMENT OF FACTS

Attorney Travis Gordon has been with JPWA for about 10 years, first starting as a law clerk.  P.H. 33.  He was admitted to practice in 2020. *Id.*  In that time, he has grown into overseeing JPWA's

debt-defense practice, which involves a "pretty robust FDCPA e(8) practice." *Id.*

AIM Financial, a credit-repair organization, made contact with Attorney Gordon and JPWA after seeing their "activity on the docket" and sought the firm's representation of it and its clients. *Id.* Attorney Gordon "enrolled those cases." P.H. 34.

The practice of writing handwritten dispute letters on behalf of debt-defense clients came from AIM Financial. P.H. 30, 33-34, 39. They draft letters on behalf of their clients. P.H. 33. As Attorney Gordon was successfully prosecuting cases on behalf of AIM Financial and its clients, he came to JPWA's owner, Attorney Josh Ward, about adopting some of AIM's practices and bringing them "in-house because its repeatable and scalable and it fits nicely into [JPWA's] bouquet of services." P.H. 34, 36. That was early-mid to Fall 2023. P.H. 24, 29, 34.

In writing dispute letters on behalf of its debt-defense clients, JPWA informs its clients about the process.

> The process works by sending handwritten dispute letters to Third-Party Creditors on your behalf, then requesting a new credit report to ensure that the creditor honored your request and updated the tradeline as "Disputed." Failing to update the tradeline violates the Fair Debt Collection Practices Act and we can assert those claims against the creditor for no cost and the creditor will have to remove the debt from your credit report and pay you a statutory fine.

*See, e.g.,* Letter to Robert Sofaly, 5/22/23.  JPWA then obtains express

agency to handwrite dispute letters on behalf of its clients.

> 3.  **AGENCY:** Client agrees to give Law Firm agency to use their personal information in processing disputes to the Third-Party Creditors, including agency to send handwritten letters to the Third-Party Creditors, styled as though they were sent from the Client. This greatly increases the chances that Creditor will violate State and Federal Laws, as handwritten letters are often overlooked and cannot be scanned into and processed by software employed by creditors to detect disputes.

Agreement for Credit Audit and Repair, ¶3.[2]

The purpose of handwriting the dispute letters is both strategic

and varied for JPWA.  First, as noted in the agency provision just cited,

styling the dispute letters as handwritten letters from the client

"increases the chances that [the] Creditor will violate State and Federal

Laws" because the handwritten letters are "often overlooked and cannot

be scanned into and processed by software employed by creditors to

detect disputes."  *Id*.  *See also* P.H. 36-40 (Attorney Ward explaining the

same); P.H. 51-52 (Attorney Gordon noting "we recognize that there's

some shortcomings in the debt collection agency's dispute processes, and

we strategize with our client to get them the best result with our

services"; "it is a way we think that these creditors won't do their due

diligence and will miss these disputes, which is beneficial to the client.")

Second, and relatedly, styling the letters "as being from the consumer"

was seen as a "best practice" in light of case law out of the Seventh

---

[2] This is part of the sealed exhibits lodged at ECF 21 and ECF 8, respectively.

Circuit–*e.g., Evans v. Portfolio Recovery Assoc., LLC,* 889 F.3d 337 (7th Cir. 2018)–where Portfolio Recovery Associates was on record contesting dispute letters as more akin to "attorney representation letters." *See* Letter to Hon. Cathy Bissoon, 2/14/24, at 3 (found at ECF 21 and ECF 8).[3]

Here, each of JPWA's clients–Sofaly and Malcom–were apprised of the letters and their contents and authorized their transmittal.  *See* P.H. 12 (Sofaly testifying he had seen the letter, read it, and "pretty much authorized everything"); P.H. 6, 10 (Malcom testifying he had seen the letter and discussed it "on several occasions").  Their letters were templates, basically capturing "the sentiment of many of [JPWA's] clients."  P.H. 29, 31, 52.  The substance of the letters are largely "fluff," "designed to have opinions in there, not facts," which are generic and interchangeable.  *See* P.H. 32, 39, 44-46, 52.

---

[3] In *Evans*, a non-profit, legal-aid organization faxed a letter on behalf of its client to Portfolio Recovery Associates' general counsel stating, in part, that "the amount reported is not accurate."  *Evans*, 889 F.3d at 342-43.  Portfolio Recovery reported the amount of the debt but did not inform the credit reporting agencies that the debt was disputed.  *Id* at 343.  It treated the letter (and others like it) as "attorney representation letters," believing the letters had not clearly communicated disputes like in the past.  *Id*.  Portfolio Recovery pushed back that the letter was letting Portfolio know that the customer was represented and that the customer didn't have money to pay the debt.  *Id*.

The following is the substance of the dispute letter broken down in individual sentences with the actual disputes emphasized in bold print:

1.    These are confusing times indeed and it has become more and more difficult for me to stay on top of everything as things become more complex and digitize and altogether tricky.

2.    I remember when things were simple and you could count on the fingers of one hand all of the accounts and business dealings that you had to keep track of.

3.    Now everything is online and it is so hard to find out what's going on.

4.    For instance apparently my finances are far more involved than I thought.

5.    **I saw that your company is reporting that I owe you a sum of money, but I just don't think that is correct.**

6.    **I am very sure that I have never been a customer or a client of yours and so I can't imagine how I could owe you anything and I don't think this is right**.

7.    In addition have you tried to go and find a new computer or a new TV or anything like that recently?

8.    It is so hard, everything is "high tec" and there are so many letters and numbers attached to everything!

9.    I just want a TV to watch the games on Sunday and meanwhile they're trying to sell me some crazy XR 65A80K thing and I just don't understand . . . Thanks for the help anyway.

Attorney Gordon agreed that the purpose of "burying the dispute in what has been called 'the fluff'" is to test the debt-collection agency. P.H. 49.  He noted that given this being a brand-new practice of JPWA, the firm was "collecting a lot of data" and trying to "strategize and do what's best for the client and . . . get the best result for the client."  *Id.*

JPWA "never intend[ed] to do anything illegal."  P.H. 36.  It adopted this practice of handwriting dispute letters from other credit-repair agencies that were having success with the practice, *see* P.H. 31, 36, and the firm did it with the strategic motive of doing what is "beneficial to the client."  P.H. 52 (Attorney Gordon noting "it is a way we think that these creditors won't do their due diligence and will miss these disputes, which is beneficial to the client.")

All of this was done pre-suit, outside of the confines of the courtroom, and all, notably, without any suggestion by Portfolio Recovery Associates that the practice ran afoul of the Rules of Professional Conduct.  Yet, nonetheless, the Court signaled that rules 1.2(d), 3.1, 3.3(a)(1), 3.4(b), and 8.4[4] may have been violated.  P.H. 67-68.  We turn to an analysis of those rules next.

---

[4] The transcript reads that the Court referenced Rule 8.3, but the substance of what the Court read pertains to Rule 8.4.  Rule 8.3 speaks to reporting professional misconduct by other lawyers.

## III.   ANALYSIS

### A.  First, a doubt about the process that has unfolded so far.

Before addressing putative rule violations of the Rules of Professional Conduct, a word is due on the proprietary of the process that's played out so far.

It is not questioned that a district court "has the power . . . to discipline attorneys who have been admitted to practice before it." *Matter of Abrams*, 521 F.3d 1094, 1099 (3d Cir. 1975).  While "[a] federal court normally disciplines an attorney after a disciplinary proceeding by the state court," *see Disbarment in the Federal Courts*, 85 Yale L.J. 975, 975 (1976), a district court's ability to do so in the first instance seems well settled.  *See, e.g., Ex parte Burr*, 9 Wheat. 529, 531, 6 L.Ed. 152 (1824) (opining "that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved" and "some discretion ought to reside in the Court" "for these objects")*; see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (same).  *But see Federal Court Authority to Regulate Lawyers: A Practice in Search of a Theory*, 56 Vand. L. Rev. 1303, 1313 (questioning, despite intimations in

Supreme Court case law, the existence of a plenary "general ethics" power in the federal courts).

In the *Matter of Abrams*, a case deciding the question of whether the District Court of New Jersey committed reversible error where it barred Abrams from practicing before it where the state court had imposed only a one-year suspension, *Matter of Abrams*, 521 F.2d at 1099, the Third Circuit reminded district courts that its disciplinary "discretion ought to be exercised with great moderation and judgment." It did so by quoting Chief Justice Marshall in *Ex Parte Barr*:

> On one hand, the profession of an attorney is of great importance to an individual, and the prosperity of his whole life may depend on its exercise.  The right to exercise it ought not to be lightly or capriciously taken from him.  On the other, it is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench be preserved.  For these objects, some controlling power, some discretion, ought to reside in the court.  **This discretion ought to be exercised with great moderation and judgment**; but it must be exercised; and no other tribunal can decide, in a case of removal from the bar, with the same means of information as the court itself.

*Matter of Abrams*, 521 F.2d at 1099 (quoting *Ex Parte Barr*) (emphasis added).  The Third Circuit noted that a "district court's action may be circumscribed to the extent that it depends in whole or in part on a state's actions, either for the commencement of the

disciplinary proceedings or for a stated basis in the determination of the sanction imposed." *Id.* at 1101. A different rule should not control where, as here, a district court has explicitly cabined its disciplinary authority by local rule.

Within this Court, Local Civil Rule 83.3 sets forth the Rules of Disciplinary Enforcement for Attorneys. Specifically, the rule provides that

> When misconduct or allegations of misconduct . . . come to the attention of a District Judge or Magistrate Judge of this Court, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these rules . . . the Chief Judge shall in his or her discretion and with prior agreement of the Disciplinary Board of the Supreme Court of Pennsylvania appoint as counsel attorneys serving in the Office of Disciplinary Counsel . . . or one or more members of the bar of this Court to investigate allegations of misconduct or to prosecute disciplinary proceedings under these rules . . . .

LCvR 83.3.B.1 Only after the appointment of an investigating disciplinary counsel, the Local Rules envision an investigative-and-recommendation process (LCvR 83.3.B.2); an Order-to-Show-Cause process (LCvR 83.3.B.3); and a hearing "before a panel of three other Judges of this Court" "if the disciplinary proceeding is predicated upon the complaint of a

Judge of this Court," (LCvR 83.3.B.4), which is certainly the case here.

Yet, so far, this is not the process that's prevailed. Inasmuch as the process was unusual in this case, the so-called "fact-finding mission" of this Court should stop in its tracks, *see* P.H. 58, 69, and the course of what's otherwise the normal process should play out as prescribed by Local Rule. That's the process that is both due and fair.

## B. The questionable process aside, there's been no violations of the Rules of Professional Conduct.

Setting aside the improprieties of the current process that's occurred thus far, JPWA nevertheless contests that there's been any violations of the Rules of Professional Conduct. Consider why.

### 1. Rule 1.2(d).

RPC 1.2(d) provides: "A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer ***knows*** is criminal or fraudulent . . . ." RPC 1.2(d) (emphasis added). Comment [10] to the rule further provides that "the lawyer is required to avoid assisting the client, for example, by drafting or delivering documents that the lawyer

knows are fraudulent or by suggesting how the wrongdoing might be concealed." *Id.*, Comment [10].

What's "criminal" or "fraudulent" is largely informed in this instance by the underlying body of FDCPA jurisprudence.  More importantly, Rule 1.2(d) prescribes conduct that is *knowingly* criminal or fraudulent.

Here, there's nothing in the record that's been developed to suggest that JPWA lawyers knew that what they were doing was criminal or fraudulent.  The letters JPWA sent and signed on behalf of their clients were expressly authorized, so they're not forgeries; the letters communicate a bona fide and actual dispute; and the substance of the letters themselves were not misleading, rather they expressed opinion-based sentiments generally applicable to many clients.  The practice JPWA employed was itself one that was being successfully used by other credit-repair organizations without as much as a peep of an objection of impropriety or illegality.

The record does not bear out knowing and flagrant violations of the criminal law, nor knowing fraudulent conduct, such as the communication of materially false facts.  JPWA merely identified a way

to advantageously assist its clients, and its creativity and enthusiasm to help its debt-laden clientele should not be stifled under the threat of professional sanctions.  *C.f. Tejero v. Portfolio Recovery Associates, L.L.C.*, 955 F.3d 453, 460-61 (5th Cir. 2020) (cautioning the district court, which found that counsel "'intentionally' drafted an unclear dispute letter," that Fed.R.Civ.P. 11 sanctions "can chill counsel's enthusiasm and stifle the creativity of litigants in pursuing novel factual or legal theories").

### 2. Rule 3.1.

RPC 3.1 provides in relevant part: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal or existing law."  Comment [1] to the rule provides important supplementary guidance:

> The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure.  The law, both procedural and substantive, establishes the limits within which an advocate may proceed.  However, the law is not always clear and never is static.  Accordingly, in determining the proper scope of advocacy, account must be taken of the law's ambiguities and potential for change.

RPC 3.1, Comment [1].

Here, there was "a basis in law and fact" for JPWA bringing each suit on behalf of its clients. JPWA communicated to Portfolio Recovery Associates that a debt was disputed; it had agency to do so; that dispute was a bona fide dispute; and Portfolio Recovery Associates failed "to communicate that a disputed debt is disputed" as required by 15 U.S.C. § 1692e(8). On these facts, JPWA's bringing the two suits that it did was not frivolous, and its actions were within "the limits" of the law, taking account "of the law's ambiguities" and the case law burgeoning in this area. *See, e.g., Evans* and *Tejero*, *supra*.

### 3. Rule 3.3(a)(1).

RPC 3.3(a)(1) provides: "A lawyer shall not knowingly make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

Here, it warrants emphasis that the RPC 3.3(a)(1) is directed at making false statements of "material" fact or law. What's "material" in the underlying suits is that there is an actual debt dispute. That's the

material fact.  Who is *actually* communicating that dispute is a

tangential point.  Additionally, all the peripheral statements around the

dispute are not material but "fluff" as repeatedly noted in the record.

Importantly, the material statement of fact (*i.e.* the disputed debt)

is not one originally made to the tribunal–it's an out-of-court

communication transmitted in the first instance to Portfolio Recovery

Associates.  For that reason, RPC 3.3(a) is not directly applicable on

this record.  And if it were insisted that it was because of the averments

made in Paragraphs 5 and 6 of the original Complaints filed in state

court, those paragraphs were appropriately amended after the cases

were removed to this Court, *see, e.g., Macolm*, 24-cv-53, ECF 5,[5] thus

complying with the dictates of RPC 3.3(a) (requiring the correction of a

false statement of material fact or law previously made to the tribunal

by the lawyer).

### 4. Rule 3.4(b).

RPC 3.4(b) provides in relevant part that: "A lawyer shall not

falsify evidence . . . ."  "Evidence" is a term of art, and RPC 3.4 is

pointed at the marshaling of evidence within the confines "of the

---

[5] In the *Sofaly* case, JPWA sought leave to amend the Complaint but it's yet to be granted leave to do so.  *See* ECF 19.

adversary system." *See* RPC 3.4, Comment [1] ("The procedure of the adversary system contemplates that the evidence in a case is to be marshaled competitively by the contending parties. Fair competition in the adversary system is secured by prohibitions against destruction or concealment of evidence, improperly influencing witnesses, obstructive tactics in discovery procedure, and the like.")

Here, the dispute letters JPWA communicated to Portfolio Recovery Associates, *first*, were not "evidence" within the meaning of RPC 3.4(b), and *second*, and more importantly, the dispute letters did not falsify what was material and important–the disputed debt. The "fluff" around the dispute was evidence of nothing, but was rather irrelevant, nonsensical opinions employed to strategically advance the debt-defense clients' interests. The letters did not bear upon "fair competition in the adversary system." *See* RPC 3.4(b), Comment [1]. They simply tested the weaknesses in an adverse party's due-diligence operations. That the effort was successful was not the consequence of falsehoods but of wit and foresight.

The Rules of Professional Conduct, it must be remembered, impose "a duty" on an advocate "to use legal procedure for the fullest

benefit of the client's cause" and to operate within the limits and ambiguities of the law. *See* RPC 3.1, Comment [1]. JPWA did just that, and that's a process to be encouraged, *not* sanctioned.

### 5. Rule 8.4(c).

RPC 8.4(c) provides: "It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." These nouns no doubt are elastic and cover a wide range of conduct. But, on this record, JPWA's conduct does not fit the bill of what this catch-all rule intends to cover.

First, JPWA's conduct was done with the knowledge and approval of its clients. Its clients, therefore, are not the possible subjects of the purported "dishonesty, fraud, deceit, or misrepresentation." And neither is Portfolio Recovery Associates for the matter.

A bona fide debt dispute was communicated to Portfolio Recovery Associates by JPWA as agents on behalf of their clients. The law does not bar JPWA from doing so. That this Court may find that JPWA intentionally drafted an unclear dispute letter to perhaps "drum up business . . . and extract attorneys' fees from unsuspecting debt collectors," *c.f. Tejero v. Portfolio Recovery Associates, L.L.C.*, 955 F.3d

453, 460-61 (5th Cir. 2020), such tactics do not detract from the material fact that an honest, lawful, true debt dispute was, in fact, represented to Portfolio Recovery Associates, which they had a legal obligation to act upon.

What's at issue here is *really* about creative credit-repair tactics that Portfolio Recovery Associates unwittingly failed to detect and which ultimately inured to the benefit of JPWA's debt-saddled clients. Certainly, reasonable minds may differ about the tactics JPWA employed, but the record of this case, at bottom, is not one of tactics that are premised wholly upon made-up, fictional debt disputes. That would be something else entirely.

So long as the debt disputes that JPWA communicated were real, and they had agency to communicate them to Portfolio Recovery Associates, JPWA acted within the ethical bounds of the law, and it violated no Rules of Professional Conduct.

## IV.   CONCLUSION

Based on the foregoing, this Court should discontinue any further "fact-finding mission" to ferret out any violations of the Rules of Professional Conduct.  No such violations exist on this record.  If the

Court is undeterred, nonetheless, it should return to normal course and follow the Local Rules of Procedure duly promulgated for initiating disciplinary actions against members of the bar of this Court.

Respectfully submitted.

*s/Ryan H. James*
Ryan H. James  (PA 313049)
JAMES LAW, LLC
1200 Lincoln Way
White Oak, Pennsylvania 15131
412-896-1349
412-896-1321 (Fax)
ryan@rhjameslaw.com

*Counsel for J.P. Ward & Associates*

Dated: March 1, 2024