IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT SOFALY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 23-2018 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| PORTFOLIO RECOVERY | ) | |
| ASSOCIATES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

-------------------------------------------------------------------------------------------------------------------

| | | |
|---|---|---|
| DAMIEN MALCOLM, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 24-53 |
| v. | ) | |
| | ) | Judge Cathy Bissoon |
| PORTFOLIO RECOVERY | ) | |
| ASSOCIATES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

**I. MEMORANDUM**

Plaintiffs' counsel have not shown good cause why sanctions should not be entered. Sanctions are warranted – and will be entered – under both sources of authority identified in the Show Cause Order ("SCO"), Doc. 28 in Civil Action No. 23-2018[1] — specifically, under Federal Rule of Civil Procedure 11 and pursuant to the Court's inherent authority.

---

[1] The SCO, and the instant ruling, have been cross-filed in Civil Action Nos. 23-2018 (Sofaly) and 24-53 (Malcolm). The docket numbers referenced herein are the ones assigned in Sofaly, 23-2018.

Plaintiffs' counsel, in responding to the SCO, get off to a rocky start. Counsel's reading of the Order, while convenient to their positions, is facially inaccurate. They write: "At this stage, this Honorable Court has narrowed its inquiry to the discretion afforded by FRCP 11." Doc. 29 at 4. It has not. Plaintiffs were ordered to show cause why their conduct "is not sanctionable, specifically as relates to . . . Federal Rule of Civil Procedure 11(b)" *and* "the Court's inherent authority to sanction for conduct that would violate an attorney's duties [under] the Pennsylvania Rules of Professional Conduct (and otherwise)." Doc. 28 at 3. This language is clear, and it cannot be squared with counsel's deliberate misreading.

Counsel's wishful interpretations come as no surprise to the Court, as it has become clear that counsel hear what they want to hear and read things as they wish for them to have been written. Counsel afford themselves the benefit of all inferences and doubts, reasonable or unreasonable. They brush over standards inconvenient to their positions. And when their conduct is questioned, they become righteous and cry persecution.

Certainly, the shading of things is an inevitable feature of advocacy. To champion its elimination would be naïve and lacking in nuance. Lawyers must remain free to argue the areas in gray. But it is a question of degree. Without boundaries, the distinctions between advocacy and duplicity fade.

Over the hue and cry of Plaintiffs' counsel, the Court will endure their claims of persecution and draw the line for them. Like so much else in these cases, their misinterpretation of the plain language in the SCO crosses that line. It is not advocacy. *See* discussion *supra*; *see also, e.g.*, Doc. 29 at 19 (characterizing Chief Judge Hornak's letter of referral to the Pennsylvania ODC as an indication that "the Western District Court is not pursuing . . . ethical remedies," notwithstanding the fact that – under Local Rule 83.3(B)(l) – the referral *itself*

evinces a threshold finding of "misconduct or allegations of misconduct" which, if substantiated, "warrant discipline").[2]

These recognitions present a through-line, as relates to the underlying lawyer conduct at issue in these cases. What counsel have done is – by now – well known and understood. Nevertheless, counsel protest that these "tactics"[3] did not originate with their firm. Counsel point the finger at credit repair organizations who they claim have engaged in similar behavior. Having mimicked the tactics, "[a]t no time did [counsel] believe [them] to be illegal or risky. As the record reflects, this practice is not original to our firm[.]" *Id.* at 3-4. Although counsel may now disclaim the suggestion, the exculpatory spirit of their offering is reflected in the next sentence: "To be clear, we do not take offense to any fair inquiry into the propriety of our practices, which are not original to our firm." *Id.* at 4 (emphasis added).

The virtues of accountability and acceptance of responsibility aside, counsel's finger pointing does not improve the picture. It merely emphasizes counsel's failure to comprehend that their ethical duties might be higher than those of non-lawyers. Counsel's lack of self-awareness, and their lack of appreciation for the positions they hold, are breathtaking.

---

[2] The Court already knows counsel's instinctive response. They will point to the subsequent clause, stating that the Chief Judge "le[ft] the decision to the Disciplinary Board." *Id.* If counsel cannot distinguish this from advocacy, an explanation may not be worth the keystrokes. It is misleading – if not inaccurate – to suggest that the Court "is not pursuing such ethical remedies." The remedies *are* being pursued, through an agreed-upon referral process directed in the Local Rule. The shame is, such manipulations are doomed to ineffectuality. Counsel are not going to trick the Court, or anyone else who reads this decision. Counsel's "spin" is not advocacy. It is a self-defeating exercise that invariably results in a total loss of credibility with the Court.

[3] Plaintiffs' counsel seem careful in affixing a label. Although they once reference the word, "scheme," Doc. 29 at 3, the usage may be viewed as a rhetorical flourish. (And there serves an example of appropriate, if not generous, legal restraint.) They seem more comfortable with the word, "tactics." *See id.* at 2. The Court will adopt their preferred term, and "tactics" it is.

The one thing that can be said to counsel's credit is, they have indeed been remarkably open regarding their practices.  This was true the first time they spoke of it, and continues to present.  At the Initial Conference in Sofaly, the architect of the tactics – Mr. Gordon – readily admitted what had been done.  Then (as now, but with modest concession) he vociferously insisted that he and his firm have done nothing wrong.  The undersigned will confess, the Court's reaction was one of disbelief, bordering on shock.  It is hard to say which was more jarring — the conduct itself, or counsel's breezy admission, bereft of self-awareness or concern.

Counsel's purported lack of comprehension continued unimpeded.  When the Court scheduled a Hearing, Mr. Gordon – unsolicited – sent a letter indicating that the undersigned had expressed "some vague consternation . . . without any additional specifics." Doc. 21 at 1 (filed under seal).  The Court was clear, however, and its concerns were not difficult to ascertain. Mr. Gordon finally appears to concede his errors of perception, as signatory of both the initial letter and counsel's latest filing.  Doc. 29 at 1, 4 & 19 (admitting the issues were "foreseeable," and the Court's inquiry "understandable . . . to some extent").  While better late than never, counsel's road to deliverance proved slow and torturous.

Given counsel's repeated opportunities to frame the issues to *their* liking, the undersigned, this once, will describe the evidence of their transgressions, minus spin and legal artifice.  Counsel and firm staff tasked themselves with drafting "dispute letter" scripts on behalf of debtors, their putative clients.  Most of the script's contents, including the passages at the beginning and the end, were a stream-of-conscience spilling of non-sequiturs and random musings.  The firm's agents tucked within the random expressions a brief, equivocal passage that *may* be interpreted as questioning the validity of a debt.  The fictional debtor stated, "I just don't

think that [the debt collection company's report that I owe it money] is correct."  Of one thing the imaginary speaker was "very sure," however:  he or she had "never been a customer or a client of" the company – and, thus, could not "imagine how [he or she might] owe [the company] anything."  And the speaker "[didn't] think this [was] right."  *See* Ltrs., appended hereto.

It seems fairly obvious that, in drafting the scripts – or their "knockoff" versions, given their admission that this was not their idea – the lawyers and support staff chose their words carefully.  While some debt collection companies act as agents for creditors, others buy debt from creditors and pursue collection on their own behalf.  Plaintiffs in these cases allege that Defendant owned the debts, and Defendant is in agreement.

Under this scenario, the debt collection company and the debtor will have had no prior dealings (unless, of course, collection activities were undertaken by the same company against the same debtor).  No prior relationship, or agreement, will have existed.  There is no privity between the collection company and the debtor, only between the original debt holder and the collection company.

In recognition of these well-worn concepts, the imaginary debtor – contemplated in the script – would be correct in saying that he or she never was a customer or client of the company.  The script does *not* deny that the imaginary debtor owes a debt, generally or in an amount reasonably corresponding with the sum sought in collection.  It merely states that the hypothetical debtor could not "imagine" how it might be owed to the company seeking collection.

It seems hard to suggest with a straight face that these subtleties were happenstance.  The language chosen by firm staff (and, presumably, the credit repair entities they mimicked) was intended to muddy the waters.  Debt collection agents (and any algorithms used by their

automated systems) would know of (or account for) a debtor's potential disclaimer of a direct relationship.  Such disclaimers uniformly are recognized to be inconsequential, practically and legally.  The only reasonable motivation for including the language, in the Court's estimation, was to play on this recognition.

Counsel have insisted that the scripts were intended to be similar to what a "real debtor" might write, accounting for their lack of sophistication.  The Court questions whether Plaintiffs' counsel are giving their putative client-base enough credit.  In any event, they have failed to introduce supportive evidence, aside from their self-serving and conclusory testimony.[4]

Placing these things to one side, the inherent deception in the "tactics" has only just begun.  The next step was, to assign the particular script (there were more than one) to multiple clients.  The weirdly worded and oddly specific scripts were handwritten by firm staff, client-by-client, one by one.  Now the strange details were attributed to a flesh and blood person (well, many flesh and blood people).  It was through these means that Messrs. Sofaly and Malcolm became joined, not only by virtue of sharing the same legal representation.  They both, according to the letters, were frustrated by advances in modern technology, they "just want[ed] to watch the games on Sunday," on a purchased, or shopped-for, "crazy XR-65A80K thing," by which they meant a specific television model.  Obviously, the Court highlights these points for effect.  The absurdity of the situation might be humorous were the subject matter less serious.

Marching along, firm staff wrote in the client's personal identifiers, and signed the client's signature.  Dare the Court say "forged" the client's signature?  Or does that invite fresh

---

[4] The concept that a creditor might sell one's debt to a collection company is not confusing, nor does it seem wholly untethered from common experience.  Perhaps the Court has greater faith in the general public, and its ability to process common experiences and reality.  While the Court can offer no evidence in support of its brighter view, the same may be said regarding counsel's dimmer one.

accusations of persecution and close-mindedness?  The Court assumes the risk and asks counsel to dig a little deeper.  By dictionary definition, "forge" means "to make or copy something, such as a document or signature, falsely <u>in order to deceive someone</u>." <https://www.britannica.com/dictionary/forge> (parentheses in original omitted, emphasis added); *cf. also* Black's Law Dictionary (12th ed. 2024) (forgery includes "[a] false or altered document made to look genuine by someone with the intent to deceive").  With these concepts, it would appear hard to quibble.

The fig leaf behind which Messrs. Gordon and Ward, the firm and their support staff hide:  their clients gave them permission to hand write their letters, sign them and send them off into the world.  According to counsel, that is agency law, plain and simple.  And agency law apparently trumps all.  If it is not obvious, here is the problem:  Principles of agency may defeat the suggestion that the firm's *clients* were deceived.  They may establish the clients' knowledge and understanding of counsel's specific intentions.  But they say nothing at all – to the Court's satisfaction, at least – regarding the likelihood, indeed the intention, *to deceive Defendant, the Court and those similarly interested.*

Important also was counsel's decision for firm staff to handwrite the letters.  As they admitted in Court, and revealed in the client contracts, counsel's efforts were specifically designed to evade common tools used by debt collection companies to detect debt disputes.  Their hope was to generate lawsuits based on the unlikelihood of the debt collection companies discerning that the debt was "disputed," given the manipulative camouflaging in the letters.

The transgressions here are not difficult to understand.  Were the scenario presented to an average person on the street, they would "smell a rat."  The Court believes that underneath all the

7

defensiveness, rationalization and bluster, counsel know it too.  If they do not, there are bigger problems than may be addressed here.

It is disappointing that no one within, or affiliated with, the firm spoke up.  The Court must believe that someone, somewhere had an inkling that the tactics were unscrupulous.  Whether such sentiments simply were not acted on, or were assuaged by reassurance, things obviously did not turn out as the participants expected.  Counsel, their staff and their clients ended up being called to testify, under oath, in federal court, to discuss their involvement.  As most often is the case, the truth eventually came out.  Watching staff and the clients testify at the Hearing was, in the undersigned's view, sad, and painful.  The witnesses dissembled and evaded.  They were not credible.  It is good fortune that none of them were drawn into a perjury inquiry.  To the extent that counsel prepared them to testify, it is cold comfort knowing that their efforts may have prevented worse.

The Court will offer no opinions regarding the specific witnesses.  Some firm staff appeared unfazed, having been filled on misguided notions of justification and righteousness.  Others appeared pained and frightened.  The undersigned is mindful of the circumstances surrounding the witnesses' involvement.  Employees have bills to pay, and the clients had no assurances (until later) that they were not personally and individually exposed.  Some likely had their faith shaken in the legal profession generally, and in the lawyers and firm management whose judgment and expertise they trusted.

The clients deserve some additional discussion. They had real life difficulties, and reached out for professional help.  In return, they ended up being called to testify in federal court.  They stuck to the narrative, which as it turns out, really only served the interests of their

lawyers.  Instead of being helped and protected *by counsel*, the clients were reduced helping and protecting *counsel*, through attempted rationalizations of the "tactics."

Having laid it all bare, the Court does not believe much more need be said. Had counsel's reactions been different, the Court's response very likely would have been different.  Once the issues had been called to counsel's attention, they could have engaged in introspection.  Had they recognized their errors in judgment, the Court could have taken into account their contrition.  They did not do so, but instead doubled down.

Initially, they engaged in a form of legal gaslighting, suggesting the inquiry was based on "some vague consternation," with no basis in fact or law.  Then they beat the drum on their "agency" theory, early and often.  Once it became clear that was unconvincing (to the Court at least), there was not much left for them in the way of defense.  Mr. Gordon, repeatedly by now, has emphasized that he genuinely did not see the ethical concerns presented.  He and his co-counsel have revealed questionable judgment, however, in terms of line drawing.  They have shown, at nearly every stage in these proceedings, a difficulty distinguishing between advocacy and manipulation.  In light of this, the sincerity of Mr. Gordon's beliefs is not a good barometer. Confessions and denials mean less coming from a person who has difficulty distinguishing between common advocacy and, shall we say, positions that are honesty-challenged.

It should come as little surprise that the legal decisions trumpeted by counsel cannot deliver what they hope.  Counsel lean most heavily on the decision in <u>Tejero v. Portfolio Recovery Assocs., L.L.C.</u>, 955 F.3d 453 (5th Cir. 2020).  As luck would have it, this Court has unfettered access to the dockets of its sister federal courts.  The information is as easy for the Court to access as any reader wishing to review the Local Rule creatively interpreted by counsel. The Local Rules, by the way, are available on the Court's website.  For the sake of convenience,

here is a link: https://www.pawd.uscourts.gov/court-info/local-rules-and-orders/local-rules. Should the reader wish a comparison, it was Local Rule 83.3.B that counsel interpreted. *See* above.

Turning back to Tejero, the dispute letter in question was dissimilar to the ones in Sofaly and Malcolm in every material respect. The Tejero letter's "dispute" section contained two type-written sentences. It would not have raised a judicial eyebrow, in this Court at least. Any comparisons or conclusions flowing from the decision have no application here and, frankly, are unworthy of additional discussion.

For ease of comparison, the Court has appended the letters in Sofaly, Malcolm and Tejero (all of which are public record) to the present filing. Those who are interested may flip to the end of this document and draw their own conclusions. The Court has reviewed the letters in the other cases cited by counsel and hopes the reader will take its word. Counsel's admitted lack of originality in tactics notwithstanding, the Ward firm letters – in comparison to the ones addressed in the reported precedent – are in a class all their own.

Sanctions are warranted, and will be entered, on both sources of duty – Rule 11 and pursuant to the Court's inherent authority. There is little benefit to parsing the many tenets breached, other than to note that counsel's filing of pleadings – attaching the letters and attributing them to the clients (with no qualification or explanation) – implicates Rule 11. Counsel's amendment of the pleadings in Malcolm and request for leave to amend in Sofaly, once they recognized the problem (or, once they recognized – in their eyes – the Court's *mistaken* belief that there was a problem), came too late. The damage already was done, and the attempted mitigation insufficient.

This is the necessary conclusion. Amendment of the pleadings cannot cleanse the taint. The factual bases for Plaintiffs' lawsuits are the letters – which were drafted by the firm's agents, handwritten by their support staff and "signed" by staff with the client's signature. It is time to say it — the *forged* letters. The lawsuits were corrupt at their inception, and they cannot go forward. With this recognition, an obvious and necessary sanction is dismissal of the lawsuits, with prejudice. The dismissal is entered pursuant to Rule 11(c), and pursuant to the Court's inherent authority.

With respect to Rule 11(c), the Court determines that dismissal suffices to deter repetition of the conduct or comparable conduct by others similarly situated, and lesser sanctions would be insufficient. All of the Rule 11(c) sanctions are entered against counsel of record in the cases, Travis Andrew Gordon, Esq., and Joshua P. Ward, Esq. The law firm of J.P. Ward & Associates, LLC, is held jointly responsible. Exceptional circumstances, as referenced Rule 11(c)(1), are lacking. In fact, a recognition of the firm's responsibility is particularly appropriate given the extensive efforts of firm staff, lawyer and non-lawyer alike, in implementing the protocols. It took a village, and the village (i.e., the firm) is responsible.

In addition, Plaintiffs' counsel will be ordered to pay <u>all</u> of Defendant's reasonable attorney's fees, expenses and costs – in both cases – up through the date of this Memorandum and Order. This includes the fees, costs and expenses (including any travel expenses) incurred by Defendant as a result of the Hearing on February 20, 2024, including attendance and preparation. The monetary sanctions are entered against Travis Andrew Gordon, Esq., Joshua P. Ward, Esq. and J.P. Ward & Associates, LLC, jointly and severally.

Given counsel's penchant for creative interpretation, the Court will be crystal clear. The monetary sanctions are entered pursuant to the Court's inherent sanctioning authority,

not Rule 11.  Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991); In re Snyder, 472 U.S. 634, 645 n.6 (1985) ("[f]ederal courts admit and suspend attorneys as an exercise of their inherent power"); In re Surrick, 338 F.3d 224, 229-31 (3d Cir. 2003) (recognizing that federal district courts have inherent authority to suspend, disbar or otherwise discipline a member of its bar); In re Mitchell, 901 F.2d 1179, 1183 (3d Cir. 1990) (same).  Given that the sanctions have not been imposed on motion, attorney's fees and expenses cannot be entered under Rule 11. *See* Rule 11(c)(4).  Although an order to pay a penalty into Court would be justified here (and sufficient but *not* excessive for the purposes of deterrence), it is more appropriate for Defendant to recoup its losses than for the Court to impose and retain a penalty.

Also, under both sources of authority, the Court will impose the following non-monetary sanctions.  Counsel shall issue, on firm letterhead, written apology letters to Messrs. Sofaly and Malcolm, affixing thereto copies of this Memorandum and Order.  The clients' use of the letters is unlimited.  They may share them with anyone they wish.  These individuals faced significant financial and legal difficulties, and they entrusted them to counsel and their firm.  They believed that counsel possessed the requisite knowledge, expertise and *judgment* to help, and they put their fate in counsel's hands.  Rather than be helped, they ended up being drawn into a quagmire they surely did not bargain for.  They were called to testify in federal court, under oath, regarding the "tactics."  Based on their demeanor, there can little doubt.  The Court is certain that the experience was unpleasant, uncomfortable and anxiety-inducing.

On the witness stand, Messrs. Sofaly and Malcolm tried their best to indicate that the identical letter contents reflected their personal views.  The Court does not think it controversial to say, their testimony was not credible.  Gratefully, the clients were able to deflect, evade and simply not-answer "well" enough to avoid a perjury inquiry.  Their testimony, however, walked

a razor's edge, and might best be described as "perjury-adjacent." In the end, however, Messrs. Sofaly and Malcolm had done nothing wrong – until they appeared in Court in a futile attempt to support and defend their lawyers. The Court understands their predicament, and their response to it. Counsel are the ones who put them in that position. The lawyers, and their firm, owe them the ordered apology.

Had the clients testified credibly during the Hearing, and had they not attempted to finesse their answers as they did, the Court might well have required counsel and the firm, as a sanction, to return and reimburse all monies they paid out. Given the way things unfolded, however, their losses seem, if not justified, an acceptable consequence.

Finally, the firm and its lawyers will be ordered to affix a copy of this Memorandum and Order to every case filed in, or removed to, this Court that relate, directly or indirectly, to their debt defense and consumer protection practice. The directive extends to all Court Divisions (Erie, Johnstown and Pittsburgh) and the attachment shall be made to the first filing made by any lawyer affiliated with J.P. Ward & Associates, LLC, that is required to be served on the other party or parties. While many of this Court's Judges have been following this matter with interest, opposing parties may not be aware of it, and it seems fitting they be made to know.

The Court concludes, pursuant to Rule 11(c)(4), that this and all other nonmonetary directives are sufficient, but not greater than necessary, to deter the conduct or comparable conduct by others similarly situated.

* * *

As the Court has intimated, a scent of impropriety hung heavy around the "tactics," in their inception, planning and execution. It should have been detectable by any number of people – the clients, firm staff and, of course, the lawyers. To the extent it was detected and

ignored along the way, the resulting silence and acquiescence speak to shortcomings than run deeper than those reflected in the legal system. They touch on matters of morality and character.

At bottom, the Court cannot countenance the utilization of deceptive "tactics" that trample the duties of professional responsibility and Rule 11. Ethical standards are enforced irrespective of *scienter*. While intentional breaches are judged and punished more harshly (and the Court finds this deception to be quite intentional), ignorance of the standards is no excuse. The source of the ignorance – whether a lack of knowledge, understanding or judgment; counsel's willingness (and eagerness) to misinterpret legal standards in their own favor; or outright gaslighting – matters not.

And just to be clear. Counsel appear to believe, through all of this, that they are the "good guys." As evinced by the chaos left in their wake, however, they are not. They engaged in a campaign of deception designed to line their own pockets. Counsel's contention that they fight for the "little guys" who are disadvantaged by debt is, to quote one of our most recent presidents, "malarkey." They developed a scheme to drum-up attorneys' fees. Counsel are well advised to heed one lesson from this experience in particular, among the many: This Court is immune from gaslighting. It will not work, and attempts will be met with great disfavor.

At the risk of lecturing the class for the misbehavior of a few, all counsel are well served to carefully consider the line between advocacy and disingenuity. Lawyers are, by nature, advocates. Although passion, or heat of the moment, have gravitational pull, counsel's reputation does not travel with a single client, or case. When they shade advocacy to advance an unsupportable position, their reputations likely will suffer. Whether it is done only here and there, or all the time, they put their reputations at risk.

Having said all of this, no person, no lawyer, and no law firm, is beyond redemption. Should someone wish for meaningful repair, he or she must engage in correction at once — completely and consistently. If they have trouble seeing the lines, they should seek guidance from others who better see them. If they are beyond hearing criticism, or do not have a sincere desire to change, the results will be the same. There is a reason for the truism regarding the repetition of aggrieved conduct and an expectation of different results.

Consistent with the foregoing, the Court hereby enters the following:

## II.  ORDER

Plaintiffs' counsel shall pay Defendant's reasonable attorney's fees, expenses and costs in the above-captioned cases, up through the date of this Memorandum and Order. This includes the fees, costs and expenses (including any travel expenses) incurred by Defendant as a result of the Hearing on February 20, 2024, including attendance and preparation. The monetary sanctions are entered against Travis Andrew Gordon, Esq., Joshua P. Ward, Esq. and J.P. Ward & Associates, LLC, jointly and severally. Opposing counsel shall file Defendant's petition for fees and costs with the Court no later than **August 23, 2024**.

By no later than **August 14, 2024**, Plaintiffs' counsel shall issue, on firm letterhead, written apology letters to Messrs. Sofaly and Malcolm, affixing thereto copies of this Memorandum and Order. Counsel shall file on the docket proof of service of said letters.

J.P. Ward & Associates, LLC and its lawyers shall affix a copy of this Memorandum and Order to every case filed in, or removed to, this Court that relate, directly or indirectly, to their debt defense and consumer protection practice. The directive extends to all Court Divisions (Erie, Johnstown and Pittsburgh) and the attachment shall be made to the first filing made by any

lawyer affiliated with J.P. Ward & Associates, LLC, that is required to be served on the other party or parties.

Finally, Civil Action Nos. 23-2018 (<u>Sofaly</u>) and 24-53 (<u>Malcolm</u>) are **DISMISSED WITH PREJUDICE**.

IT IS SO ORDERED.


August 5, 2024                                          <u>s/Cathy Bissoon                        </u>
                                                        Cathy Bissoon
                                                        United States District Judge

cc (via ECF email notification):

All Counsel of Record